William P. BISSETT, Jr., et al., Plaintiffs-Appellees Cross-Appellants,

v.

PLY–GEM INDUSTRIES, INC., et al., Defendants-Appellants Cross-Appellees.

No. 74–2272.

United States Court of Appeals, Fifth Circuit.

June 9, 1976.

Rehearing Denied July 26, 1976.

Robert R. Feagin, III, Tallahassee, Fla., for Ply-Gem.

Leo H. Raines, New York City, for Paneling Studio.

Coleman R. Rosenfield, Fort Lauderdale, Fla., C. Lanny McCullers, Tampa, Fla., Alan G. Greer, Andrew C. Hall, Miami, Fla., for plaintiffs-appellees-cross-appellants.

Before MORGAN, CLARK and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge.

After an eight-day trial, this case was submitted to the jury on two theories of liability: (1) an alleged "tying" arrangement in violation of the federal antitrust laws, and (2) a charge that, by eight separate misrepresentations, defendants fraudulently induced plaintiffs to sign a franchise agreement, in violation of the laws of Florida[1]. In its answers to special interrogato-

---

1. The alleged "tie-in" was claimed to be in violation of Section 1 of the Sherman Act, Title 15, United States Code, Section 1, and Section 3 of the Clayton Act, Title 15, United States

ries, the jury found for defendants on the "tying" issue and for plaintiffs on the claim of fraudulent inducement of a contract. An award of $72,750.00 was made of compensatory damages, and an equal amount was awarded as punitive damages. After the district court's denial of their motion for judgment n.o.v., defendants appealed from the final judgment which had been entered on the jury's verdict.[2] We affirm.

## I

From October 1968 until July 1971, plaintiffs were franchisees of defendant Paneling Studio, Inc., which was a wholly-owned subsidiary of defendant Ply-Gem Industries, Inc., and served as the parent corporation's franchise arm. As franchisees, plaintiffs were responsible for the sale of Ply-Gem's plywood paneling and certain related products in Tampa, Florida. The execution of the franchise agreement in late October of 1968[3] followed a series of negotiations in several cities between the individual plaintiffs and various officers and other employees of the defendants. Plaintiff Bissett, both then and later, was the dominant figure on the side of the prospective franchisees. Howard Steinberg, at that time a Paneling Studio vice president[4], was the defendants' chief negotiator. The statements allegedly made to plaintiffs by Steinberg and other Ply-Gem and Paneling Studio employees during these discussions are the basis for plaintiffs' claims of fraudulent inducement. Since defendants had not previously maintained a retail outlet in Tampa, it was necessary for plaintiffs to start an entirely new operation instead of assuming the management of an existing business. On the advice of defendants, plaintiffs decided to open two retail stores and a warehouse. With the assistance of Peter Insalaco, one of defendants' employees, plaintiffs were able to begin operations in early 1969.

Despite considerable efforts on the part of both plaintiffs and defendants, the franchises lost money from the beginning. To help ease this situation for the plaintiffs, several changes were made. In July of 1969, a few months after the stores were opened, one Floyd Allison purchased the less active of plaintiffs' outlets after being referred to plaintiffs by an employee in defendants' New York office. Also, plaintiffs soon began to reduce the number of their employees in order to cut costs. During the spring of 1970, further adjustments were made. In March, defendants assumed most of the financial and operational responsibility for the Tampa warehouse. Two months later, an easier payment schedule was agreed upon for the satisfaction of plaintiffs' debt to defendants. At about the same time, in February of 1970, a second franchise agreement replaced the first. However, the only significant change was the substitution of a corporation, Panel Distributors, Inc., for the individual franchisees. This corporation, also a plaintiff herein, was in fact controlled by plaintiffs Bissett and Brown.[5]

Even after these changes, plaintiffs continued to lose money. At trial, several reasons were offered for the plaintiffs' failure to show a profit. The "tightness" of the money market and the associated ills of the

Code, Section 14. Jurisdiction over the antitrust claim was grounded upon Title 15, United States Code, Section 15. The state law claim was properly before the district court because of diversity of citizenship, Title 28, United States Code, Section 1332, and because it was pendent to the federal claim.

2. Plaintiffs noticed a cross-appeal but have failed to pursue the matter further. Only the defendants' appeal is before this Court.

3. Plaintiff Bissett signed the agreement on October 21, 1968. Plaintiff Brown added his signature on October 25, 1968. Final written approval of the agreement was not given by defendant Paneling Studio, Inc., until November 25, 1968.

4. By the time of the trial, Mr. Steinberg had become president of Ply-Gem Home Centers, Inc., successor corporation to Paneling Studio.

5. Until January of 1971, Bissett and Mr. D. G. Shults each owned 35 percent of the company's stock, and Brown owned 30 percent. In that month, Bissett acquired Shults' stock, and thereafter he and Brown were the only shareholders.

construction industry in Tampa were important factors. However, as established by Bissett's uncontradicted testimony, the major problem was that the plaintiffs could not offer competitive prices. If they lowered their prices to meet the competition, their costs were such that they could not profit from their sales. On the other hand, if they raised their prices they could not attract customers. By far the most important cost item was the high prices which plaintiffs had to pay for Ply-Gem's products. After suffering the results of this dilemma for two and a half years, plaintiffs terminated their franchise in July of 1971.

## II

Defendants make two vigorous challenges to the instructions given by the trial judge. As will become evident from our detailed discussion *infra*, we agree with defendants that several of plaintiffs' fraudulent inducement claims can be read as alleging either an unfulfilled promise or an opinion that was proved wrong by subsequent events. However, we find no reversible error in the court's definition of the circumstances in which promises and opinions are actionable misrepresentations under Florida law.

■■■ (A) *Promissory misrepresentations.* We agree with defendants that the court's instructions on this issue were less than complete. The court properly instructed the jury that an alleged misrepresentation must relate to a material fact, and that a misrepresentation is actionable only if the defendant knew or should have known that the statements were false, or if the statements were made without knowledge of their truth or falsity. See, e. g., *Nantell v. Lim-Wick Const. Co.*, 228 So.2d 634, 637 (Fla.App.1970). However, the court failed to explain the application of these general principles to cases involving false promises. Florida law treats a promissor's intent as a material existing fact. Accordingly, a promise is actionable as fraud only when the promissor had a positive intent not to perform his promise, or made the promise without a present intent to perform it. See, e. g., *Home Seekers' Realty Co. v. Meanear*, 102 Fla. 7, 135 So. 402, 402–03 (Fla.1931). The court below gave no specific instructions to this effect, but merely stated: "Ordinarily, a promise to do something in the future cannot be made the basis of a claim for fraud." We are unable, though, to find reversible error on this point. The record reveals that defendants failed to request the instruction which they now are claiming that the Court should have given. Instead, defendants requested a grossly erroneous instruction which would have denied recovery for any unfulfilled promise, regardless of the promissor's intent [6]. As a general rule, an appellant cannot assign as error the trial court's failure to give an instruction which was not requested. See F.R.Civ.P. 51. We find nothing in the present case to bring it out of the general rule. Unlike *Wirtz v. International Harvester Co.*, 331 F.2d 462, 466 (5th Cir.), *cert. denied*, 379 U.S. 845, 85 S.Ct. 36, 13 L.Ed.2d 50 (1964), this is not a case where an error was so plain and fundamental as to withhold from the jury the essen-

**6.** The requested instruction (Defendants' Requested Jury Instruction No. 21) was as follows:

This is *not* a suit for breach of contract and plaintiffs may not recover in this action for the alleged failure of defendants to perform promises contained in the written contracts between the parties. Nor may the plaintiffs recover for the alleged failure of defendants to perform promises made to induce plaintiffs to enter into the contracts. A promise to do something in the future, even if made as a representation to induce another person to enter into a contract, does not amount to fraud in the legal sense. Therefore, if you find any of the misrepresentations alleged by plaintiffs constituted a promise by defendants to do something in the future, then you must deny plaintiffs recovery based on any such misrepresentation.

At oral argument, counsel attempted to justify this instruction by arguing that the evidence in the case would not support a conclusion that defendants made any promises without the intent to perform them. This, of course, is merely another way of saying that defendants' motions for directed verdict and judgment n. o. v. should have been granted for insufficient evidence, a contention which we consider *infra*.

tial ingredients of a cause of action. The court's charge was clearly correct as to the general requirements for fraud. There would also appear to be little prejudice, if any, to defendants in the instruction as given, which stated that ordinarily a plaintiff could *not* recover on the basis of a promissory misrepresentation. We can find, then, no plain error or manifest injustice such as that which has led to the occasional decisions such as *Wirtz*, that have overlooked a party's failure to preserve a point properly for appeal.

    █ (B) *Opinions.* Defendants claim that the court erred in not instructing the jury that projections of future profits or business success can never constitute fraud [7]. We disagree. This case is properly classed with those which have held that expressions of opinion can be actionable if the declarant had exclusive or superior knowledge of the facts underlying the opinion [8]. Under these cases, a plaintiff may recover upon a showing that the defendant knew, or should have known, that the facts in his possession invalidated the opinion which he expressed. See, e. g., *Vokes v. Arthur Murray, Inc.,* 212 So.2d 906 (Fla. App.1968); *Ramel v. Chasebrook Const. Co.,* 135 So.2d 876 (Fla.App.1961) [9]. The instruction given below [10] correctly stated these principles, and we find no error therein [11].

### III

    █ It is also alleged that there was insufficient evidence to submit the eight claims of fraudulent misrepresentation to the jury. We will consider these eight alleged misrepresentations in the order in which they are set forth in the complaint and in the jury instructions. The standards for our review are clear. There must be sufficient evidence to show (1) that the defendants misrepresented a material fact; (2) that the defendants knew, or should have known, the falsity of their statements, or made such statements without knowledge of their truth or falsity; (3) that the defendants intended to induce the plaintiffs to act upon the representation; and (4) that the plaintiffs were injured while acting in justifiable reliance upon the representation. See *Nantell v. Lim-Wick Const. Co., supra,* 228 So.2d at 637. Sufficiency of the evidence must be determined in light of the familiar principles of *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969) (en banc):

---

7. Defendants' Requested Jury Instruction No. 20 was as follows:

    Misrepresentations as to future profits or business success are not misrepresentations of material existing fact and, therefore, cannot be the basis for a claim of fraud. If you find that any of the alleged misrepresentations under which plaintiffs base their claims constitute representations of future profits or business success, then you must deny plaintiffs recovery on such alleged misrepresentations.

8. Defendants offer no reason why opinions as to future business prospects should not be subject to the same legal principles as other opinions concerning future events. The case of *Vokes v. Arthur Murray, Inc.,* 212 So.2d 906 (Fla.App.1968), adequately disposes of the notion that projections of the future course of events cannot be actionable.

9. We do not regard these cases as at all inconsistent with broad statements in other Florida decisions, see, e. g., *Sparks v. State,* 256 So.2d 537, 538 (Fla.App.1972), to the effect that predictions of future events are generally not a basis for common law fraud. These decisions did not deal with the exception to this general

rule which is discussed by the cases cited in the text.

10. The court gave the following instruction on this point:

    [T]he mere expression of an opinion does not constitute a basis for a claim of fraud unless the party making such statement has exclusive or superior knowledge of facts inconsistent with such statement.

11. Defendants also point out a minor deviation between their proposed instruction on waiver (Defendants' Requested Jury Instruction No. 23) and the instruction given by the court. The court's charge spoke of a "contract for the purchase of property" rather than merely a "contract", as in defendants' proposed waiver instruction. Such error, if error there be, was certainly harmless, as the contract in question was in fact one for the purchase of "property" —i. e., a franchise. Furthermore, the special interrogatory to which this instruction refers (Question No. 11 of the special verdict form) makes no limitation to "property" contracts, but speaks simply of a "contractual arrangement".

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

After the most careful examination of the voluminous record in this case, we hold that the evidence, while considerably less than overwhelming, was sufficient to establish plaintiffs' case under the liberal standards of *Boeing Co. v. Shipman.*

(1) *The alleged misrepresentation "that Defendants provided franchisees with expert management advice and assistance."* The main issue here is how to characterize Mr. Peter Insalaco, who spent several weeks in Tampa helping the plaintiffs set up their franchises. Drawing all reasonable inferences in favor of the plaintiffs, we find substantial evidence in the record that Insalaco was represented to plaintiffs as an expert in establishing franchises and that in fact he was not such an expert. Prior to his association with plaintiffs, Insalaco had set up only one franchise. Insalaco's own deposition, which was read into evidence at trial, shows that he had received virtually no training in the establishment of Ply-Gem franchise stores. The evidence also permits the conclusion that Insalaco was unable to provide any informed guidance in such crucial areas as personnel and inventory, and that his poor advice led to excessive costs for the plaintiffs. It was also reasonable for the jury to infer that defendants should

have known of Insalaco's inexperience and lack of expertise. We are unimpressed by defendants' contention that, since plaintiffs knew who the purported expert was, they did not justifiably rely upon defendants' assurances as to his expertise. Nothing in the record justifies a conclusion that, as a matter of law, it was unreasonable for plaintiffs not to go behind these assurances and ferret out the details concerning Insalaco's knowledge and experience. We find sufficient evidence in the record to support each element of this alleged fraud.

(2) *The alleged misrepresentation "that the number of franchise outlets, which Defendants from time to time proclaimed as evidence of their growth and of the profitability of a Ply-Gem franchise, showed a straight line upward increase in store units."* There would seem to be two parts to this rather inartfully worded claim: (a) that Ply-Gem franchises were profitable, and (b) that, as a result of such business success, the number of franchises was increasing. It will be seen that part (a) duplicates the first part of the seventh claim, and overlaps substantially with the third claim; both of these claims are discussed *infra.* As will be shown in our treatment of those claims, there was substantial evidence that defendants induced plaintiffs to sign the October 1968 agreement by false representations as to their other franchises' profitability, and that these representations were made at a time when defendants knew or should have known of their franchises' true financial condition. Therefore, part (a) of this claim was supported by sufficient evidence. We also find substantial support in the record for a conclusion that defendants represented to plaintiffs that their franchise business was growing as a result of the franchises' financial advances. The record establishes that any expansion in defendants' franchise operations was not due to the success of existing franchises, whose financial status in October 1968 was shaky at best. Defendants' representations to the contrary were false, and the jury could reasonably have concluded that they should have known this. We

find no error in the trial court's handling of this claim [12].

(3) *The alleged misrepresentation of "the net income which could be derived from the operation of a Ply-Gem franchise at given levels of gross sales."* This claim derives from a "pro forma profit and loss statement" that was given to plaintiff Bissett in August of 1968, and from Steinberg's alleged misrepresentations concerning the statement. The statement, which was received in evidence as Plaintiffs' Exhibit # 1, shows three columns, each of which contains figures representing sales, cost of goods, and various expenses, together with several calculations based upon these figures. Thus, there are entries for gross profit, net profit, and for percentage return on an investment of $15,000.00. Generally, the entries increase from left to right. For example, the figure for "monthly profit" is $1,310.00 in the left column, $1,571.00 in the middle column, and $2,488.00 in the right column. We find ample evidence to support plaintiffs' contention that this statement was represented to be an average of the actual experiences of Ply-Gem's outlets (indeed, the statement is entitled "Average Monthly P&L Statement, Ply-Gem Paneling Studio"). From left to right, the three columns were alleged to represent the accomplishments of an average Ply-Gem retail store after six, twelve, and eighteen months of operations, respectively. The evidence also shows that the real achievements of Ply-Gem's stores were substantially less impressive than what these figures would lead one to believe. Most of these outlets were operating at a loss or showing extremely meager profits. Whether one scrutinizes only the franchise stores, or includes the company-owned retail outlets as well, it can reasonably be inferred that the stores' average profits were much less than those attributed to the average store in the P&L statement. The jury was also entitled to find that defendants should have known of their stores' actual performance at the time when they were inducing plaintiffs to purchase Ply-Gem franchises [13]. Nor are we persuaded that, as a matter of law, plaintiff Bissett did not reasonably rely upon the P&L statement and the representations concerning this statement. This conclusion is alleged to follow from Bissett's realization that his own profits would depend in part upon prevailing costs of conducting a business in Tampa. In our view, the jury could reasonably decide that such knowledge did not mitigate the force of the misrepresentations. There was no reason for Bissett not to assume that basic costs in Tampa would be roughly equivalent to those elsewhere, and in fact this appears to have been the case. No such cost differential was ever alleged to be a source of plaintiffs' difficulties, and any understanding which Bissett had with respect to these costs is irrelevant to this lawsuit.

(4) *The alleged misrepresentation that "the franchise program and merchandising concept relating to it were an integral part of the business philosophy of the Defendant Ply-Gem and Plaintiffs would gain the ben-*

12. Stripped of its references to the franchises' profitability, this claim could be read simply as a representation that the number of Ply-Gem franchises was increasing. There is nothing to indicate that such was not the case in October of 1968. However, this narrower reading of the second claim would reduce it to an allegation that was never advanced by any witness in the trial and which was not mentioned in plaintiffs' jury arguments. The danger that the jury could have based its verdict on their acceptance of such an allegation is virtually zero, and we can find no sufficient likelihood of prejudice to the defendants for us to reverse on this point.

13. Contrary to defendants' contention, we see no reason why the jury was bound to consider only the written P&L statements which defendants had received by the fall of 1968. It was permissible for the jury to conclude that the defendants should have known of the poor performance of those stores which had not submitted written statements. There is substantial evidence that defendants were aware of the financial condition of these stores, many of which were company-owned and all of which dealt extensively with defendants and were supervised to varying degrees by them. Moreover, the written statements themselves (Defendants' Exhibits 22, 23, and 24) tend to show a lower average monthly net profit per a given sales volume than is reflected in the "average" P&L statement.

efit of the stature, experience, financial support and knowledge of the Defendant Ply-Gem." On this issue, the evidence shows that the franchise program was a quite recent innovation for the defendants, that it was still very much in the experimental stage, and that their personnel had very little training and experience in the franchise field. The jury could properly find that the franchise program was too new, untested, and undeveloped to be an "integral part" of Ply-Gem's operations, and that plaintiffs were misled as to the amount of experience and expertise they could draw upon as Ply-Gem franchisees. There was also substantial evidence that, albeit perhaps unintentionally, plaintiffs were deceived into thinking that the combined purchasing power of Ply-Gem's stores was available to reduce the costs of their own products and thus to enable them to offer highly competitive prices. In fact, defendants should have known that plaintiffs' franchises would be operated on a different basis from company-owned stores, and that no such cost advantages were to be expected[14]. The record also supports the jury's conclusion that plaintiffs justifiably relied upon these misrepresentations, as there is no basis for ruling as a matter of law that plaintiffs should have been able to unravel the defendants' multifaceted pricing policies in the face of assurances that they would be given favorable treatment.

(5) *The alleged misrepresentation that "[Defendants] would assist in selection of a site for the business of Plaintiffs and from which in the knowledge and experience of Defendants the site would be profitable."* As argued to the jury, what this awkwardly worded claim meant was that (a) defendants represented to the plaintiffs that they had performed an in-depth study of the Tampa area, and (b) on the basis of this study, profitable sites would be selected for two franchises and a warehouse. The record permits a jury conclusion that Steinberg misrepresented to plaintiffs the extent to which his firm had studied and surveyed the Tampa area. In reality, the studies and surveys appear to have consisted of little more than looking up Tampa's population (First Supplemental Record on Appeal, Volume One, Trial Testimony of Howard Steinberg, at pages 35–39). There was ample reason for the jury to decide that no "study" was made as represented; and that the assurances of profitability predicated upon the alleged "study" were meaningless and should have been recognized as such by the defendant[15].

(6) *The alleged misrepresentation that defendants "would provide all of the services represented by Defendants as incumbent upon a franchisor as advertised by Defendants."* To a great extent, this allegation is duplicative of the first, fourth, and fifth claims, and what was said *supra* about the provision of expert assistance, the availability of mass purchasing power, and the action to be taken on the basis of a profitability "study" applies here as well. Furthermore, the evidence allows the conclusion that defendants misrepresented the management guidance, sales experience, advertising expertise, research and development support, and similar services which they could make available to a franchisee. The jury might reasonably have felt that the defendants could not have intended to provide assistance which they did not have at their disposal. Therefore, under the

---

14. As we view the matter, it makes no difference whether one considers this as a misrepresentation of the facts as of the fall of 1968, or whether one descries a promissory component. Even under the latter theory, there was ample basis for an issue as to whether defendants intended to benefit plaintiffs by means of favorable pricing policies, or whether defendants intended to make available to plaintiffs the expertise and experience which they did not possess. Even assuming that defendants have preserved this point for appeal (lack of promissory intent as to the various claims was specifically assigned in support of the motion for directed verdict at the end of the plaintiffs' case, but not in support of the directed verdict motion at the end of trial or the motion for judgment n. o. v.), we see no merit therein.

15. As to the promissory component in this claim, we once again find it unnecessary to decide whether defendants have preserved this evidentiary point for appeal. See note 14, *supra.*

principles of Florida law discussed *supra*, this promissory representation was properly submitted to the jury.

(7) *The alleged misrepresentation "that all Ply-Gem panel centers were profitable, and in reliance thereon the Plaintiffs would anticipate a profitable and successful career as a Ply-Gem franchisee."* This allegation is intimately connected with the third claim discussed *supra*. There is ample evidence that, at the time of the alleged fraudulent inducement of the October 1968 franchise contract, many of Ply-Gem's stores were either operating at a loss or turning a far lower profit than plaintiffs were being led to believe. The testimony of defendants' own chief witness, Howard Steinberg, established that in 1968 numerous outlets, both franchises and company-owned retail stores, were suffering losses or generating only a slight profit (see, e. g., First Supplemental Record on Appeal, Volume One, Trial Testimony of Howard Steinberg, at pages 77–85.) The jury could reasonably have concluded that defendants misrepresented the profitability of their stores, and that they should have known the falsity of such representations [16]. Likewise, it was permissible to infer that defendants had superior knowledge of their franchises' profitability, that the facts available to them contradicted the opinion they gave concerning plaintiffs' probable business success, and that therefore this opinion was actionable under Florida law.

(8) *The alleged misrepresentation "that Tampa could support a warehouse distribution center and that Plaintiffs could realize added profits by opening one immediately."* The record supports an inference that defendants in fact made this representation, which in substance was a claim that plaintiffs could turn a substantial profit from the beginning by operating two retail stores and a warehouse. From the evidence, a jury could also conclude that defendants' experience should have taught them that this representation was false. On the basis

of their experiences elsewhere, defendants could be expected to have known that a franchisee operating two stores would usually make only a small profit, if any, at the beginning, and that the substantial cost of operating a warehouse would reduce the chance of a profit in the start-up period still further. It was also proper to infer that defendants had superior knowledge of their own past operations, and that therefore this representation constituted fraud despite the fact that it was an opinion.

■ Because we find sufficient evidence to support each of the alleged misrepresentations, we need not decide whether reversal would be proper if some of the claims were supported by the evidence but others were not. We do feel, though, that, to remove all possible doubt, it is clearly the preferable procedure to use separate interrogatories for each alleged fraud in a case such as this. See *Weymouth v. Colorado Interstate Gas Co.*, 367 F.2d 84, 93 n. 31 (5th Cir. 1966), and cases there cited.

### IV

■ We agree with plaintiffs that the jury's award of punitive damages should be left undisturbed. With all reasonable inferences drawn in plaintiffs' favor, the evidence reflects a series of substantial falsehoods uttered by corporate employees for the purpose of inducing newcomers to join the business. In their eagerness to expand their company's operations into a new area, the defendants' agents repeatedly mis-stated the nature and past history of the product they were touting—i. e., Ply-Gem Franchises. These misrepresentations were made when the defendants knew that the facts were to the contrary, or at least when such facts were readily available and should have been consulted. The record supports a jury finding that in their dealings with plaintiffs the defendants behaved with that "reckless indifference for the rights of others" which will justify an award of punitive damages under Florida law. See *Richards*

---

**16.** As in note 13, *supra*, we reject defendants' suggestion that the jury could consider, as evidence of the defendants' knowledge, only those written reports which had been submitted to defendants by the fall of 1968.

*Co. v. Harrison*, 262 So.2d 258, 262 (Fla.App. 1972).

## V

Finally, defendants have asked us to rule as a matter of law that plaintiffs have waived their rights to seek damages for the alleged frauds. This waiver is alleged to have taken place when, in the spring of 1970, certain adjustments were made in plaintiffs' obligations—i. e., a new franchise agreement, the assumption by defendants of most of the responsibility for the Tampa warehouse, and some alterations in the method of satisfying plaintiffs' debt to defendants. Our attention is drawn to a number of Florida cases which have found a waiver when the allegedly defrauded party has entered into a new agreement respecting the subject matter of the prior alleged fraudulent transaction. See, e. g., *Storrs v. Storrs*, 130 Fla. 711, 178 So. 841 (1937). However, these cases make it clear that waiver will be found only if the later agreement was made with actual or imputed knowledge of the facts constituting the alleged fraud. *Id.* 130 Fla. 711, 178 So. at 845. Thus, the Court's instructions in the present case properly limited waiver to cases where the party claiming fraud "had discovered or reasonably should have discovered the nature of the deception . ." [17]. Under the standard of *Boeing Co. v. Shipman, supra*, there was ample evidence upon which the jury could properly have resolved this issue against defendants. Certainly, by 1970 the plaintiffs should have learned that defendants had made some misstatements about the future course of events. However, we cannot conclude, as a matter of law, that plaintiffs should have known by then of the *fraudulent* nature of these misstatements. The jury was entitled to find that plaintiffs reasonably failed to discover what facts had been available to the defendants in the fall of 1968. Without substantial knowledge of such facts, and of the defendants' access to such facts, plain-

tiffs could not have realized how great a conflict there was between defendants' representations and what defendants knew or should have known at the time of the representations. Only if this realization can be imputed to the plaintiffs would there be a waiver of any claims of fraud. Our conclusion on this point is buttressed by the evidence in the record that defendants continued to mislead the plaintiffs after the original contract was signed. Thus, for example, throughout this period defendants advised plaintiffs that the other franchises were making large profits. When plaintiffs asked why their own experience was so different, and requested advice as to how to become competitive, defendants referred them to their Miami "franchise". In reality, the Miami store was not a franchise at all, but was a company-owned outlet with substantial advantages (especially in the form of lower prices for Ply-Gem products) which were not available to the plaintiffs. Plaintiffs were not told of these differences, and the reference to the Miami "franchise" thus served merely to deflect plaintiffs' attempts to discover the facts. On this record, we are unwilling to say that plaintiffs' continued ignorance was unreasonable, that knowledge of their fraud claims should be imputed to plaintiffs as of the spring of 1970, and that they necessarily waived these claims as a result.

## VI

For the reasons we have given, we hold that no reversible error appears in the trial court's instructions, that the eight claims of fraudulent misrepresentation were properly sent to the jury, that the evidence supports the jury's award of punitive damages, and that the plaintiffs did not waive their fraud claims as a matter of law. Therefore, the decision of the district court is AFFIRMED.

---

17. As we have already indicated, see note 11 *supra*, we see no merit in defendants' contention that the court's limitation of waiver to contracts "for the purchase of property" is reversible error.