Larry T. VARNUM, Plaintiff-Appellant,

v.

NU–CAR CARRIERS, INC.,
Defendant-Appellee.

No. 85–3898.

United States Court of Appeals,
Eleventh Circuit.

Nov. 20, 1986.

Rehearing and Rehearing En Banc
Denied Dec. 23, 1986.

John W. Pafford, Jacksonville, Fla., for plaintiff-appellant.

Guy O. Farmer, II, Mark V. Young, Smith & Hulsey, Jacksonville, Fla., for defendant-appellee.

Before FAY and JOHNSON, Circuit Judges, and HOFFMAN *, Senior District Judge.

JOHNSON, Circuit Judge:

This is an appeal from an order granting summary judgment to the defendant. We reverse.

## I. BACKGROUND

Plaintiff-appellant Larry Varnum is a truck driver who sought employment with defendant-appellee Nu-Car Carriers, Inc., a common carrier engaged in the transport of new cars. In order to gain employment with Nu-Car, a trucker must purchase his own equipment, including a certain type of tractor-trailer not more than two years old, which equipment costs about $60,000. Appellant negotiated with a representative of appellee in May 1983 regarding employment. During their discussions, the representative told appellant that appellee allocated work according to a first-in-first-out basis that provided equal work opportunities to truckers regardless of their seniority. Truckers were paid about 65% of the gross amount that Nu-Car received for each load the trucker transported; therefore, the truckers' income depended on the availability of loads to transport. The statement concerning the dispatch system was consistent with the collective bargaining agreement in effect at that time between Nu-Car and the union representing Nu-Car's employees.

The representative also showed appellant computer printouts that indicated that the average monthly gross income for truckers with Nu-Car, based on the past few months, had been about $7,000. The information contained in these printouts was correct.

While appellant was negotiating about employment with Nu-Car, Nu-Car was drafting a proposal to switch to a seniority-based dispatch system. Under this dispatch system, new loads would be assigned to the most senior trucker available. Since there were usually several truckers on hand at the time Nu-Car was needed to transport a load, this system would have a disastrous effect on the new truckers: it would have the effect of laying some of them off. The new system was partially designed to enable Nu-Car to save on the costs of health care, welfare, and pension benefits. Under the new system, Nu-Car would not be required to make a weekly contribution for health care, welfare, and pension benefits for any owner-operator who did not work during a particular week.

There is evidence that the representative for Nu-Car knew of the proposal during the employment negotiations, yet failed to inform appellant of the pending change. Deposition of Paul McAllister, at 37–39; affidavit of Paul McAllister, at 1–2. More significantly, the representative knew that if the change was agreed to, his representation that appellant might earn $7,000 per month would be false.

After June 27, 1983, Nu-Car and the Union began to renegotiate the collective bargaining agreement. These negotiations resulted in a new agreement, concluded on about July 8, 1983, which included a change in the dispatch procedure to a seniority-based system.

Appellant began to work for Nu-Car on June 2, 1983. For his first one-and-a-half months of employment, he was dispatched under the first-in-first-out system. The new dispatch system was then put into effect, and Varnum's income fell sharply. Varnum resigned from Nu-Car in March 1984. At the time he resigned, Varnum had not filed any grievance under the machinery provided by the collective bargaining agreement.

In November 1984, Varnum filed a complaint against Nu-Car in Florida state court alleging that Nu-Car had fraudulently misrepresented to him the conditions of employment in order to induce him to accept employment. Varnum sought compensato-

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

ry and punitive damages. In December 1984, Nu-Car removed the action to the United States District Court for the Middle District of Florida, based on diversity of citizenship.

In June 1985, Nu-Car moved for summary judgment on three grounds: (1) that the action was preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185 ("Section 301"), which authorizes suits between labor organizations and employers for breach of a collective bargaining agreement; (2) that the action was preempted by the National Labor Relations Act ("NLRA"); and (3) that, because of the nature of the collective bargaining process, Varnum cannot possibly show a *prima facie* case of fraudulent misrepresentation. In late July 1985, Varnum filed a brief in response to Nu-Car's motion. A hearing on the motion was held in October 1985 before the district judge. At the conclusion of the hearing, the district judge orally ruled that the terms of Varnum's employment that were allegedly misrepresented were specifically addressed in the collective bargaining agreement. Therefore, the court held that Varnum's state law claim was preempted by Section 301 and granted summary judgment in favor of Nu-Car. However, the court gave Varnum 20 days in which to amend the complaint and allege misrepresentations with respect to subjects not covered in the collective bargaining agreement. Varnum did not amend the complaint, and he filed a timely notice of appeal from the order of the district court.

## II. FRAUD CLAIM NOT PREEMPTED BY SECTION 301

The essence of appellant's complaint is that, because Nu-Car's representative knew that Nu-Car was planning to implement a seniority-based dispatch system, his representation that appellant could expect to gross about $7,000 per month was fraudulent. The district court found that the gravamen of appellant's complaint was about the change in the dispatch system. The court found that, because the terms of appellant's employment were established

through the collective bargaining agreement, appellant's complaint related to the collective bargaining agreement itself. Therefore, the court found that appellant's state court claim was preempted by federal law. The district court relied upon *Eitmann v. New Orleans Public Service, Inc.*, 730 F.2d 359 (5th Cir.1984), in which the court held that where an employee who is covered by a collective bargaining agreement seeks to redress a grievance subject to its terms, he must follow the procedures provided for in the collective bargaining agreement or seek a remedy under Section 301 for violation of that agreement.

■ The district court misconstrued the essence of appellant's complaint. Appellant did not complain about the seniority dispatch system itself but, rather, complained about the failure of Nu-Car to inform him of the impending change while inducing him to accept employment. Thus, appellant's complaint did not go to a term of employment covered by the collective bargaining agreement. Instead, the complaint involved Nu-Car's conduct prior to appellant's accepting employment. Because the complaint focused on conduct that occurred prior to the plaintiff's accepting employment, the case is distinguishable from *Eitmann* and is not preempted by Section 301. *Cf. Belknap, Inc. v. Hale*, 463 U.S. 491, 509–11, 103 S.Ct. 3172, 3182–83, 77 L.Ed.2d 798 (state law action for misrepresentation by employees who had replaced strikers and were subsequently discharged, although the replacements had been told prior to their accepting employment that they would be "permanent replacements," was not preempted by federal labor laws).

## III. FRAUD CLAIM NOT PREEMPTED BY NATIONAL LABOR RELATIONS ACT

Appellee's second argument as to why summary judgment was appropriate is that the NLRA preempts a fraud claim based on the failure of a company to disclose an impending change to a prospective employee, where the company has not yet proposed the change to the union. Specifical-

ly, appellee contends that to inform a prospective employee of the company's bargaining proposal to change to a seniority-based dispatch system would have been "direct dealing" which was prohibited under the Section 9(a) of the NLRA. Appellee argues that this state law action therefore seeks to regulate conduct which is prohibited, and thus preempted, by the NLRA.

■ This argument would make sense if appellant's claim was that Nu-Car had a duty to disclose the fact that it was drafting a proposed change in the seniority system. However, appellant did not claim that Nu-Car had a duty to make such a disclosure; rather, appellant claimed that in the absence of such a disclosure Nu-Car should not have told him that he could earn $7,000 a month. Since appellant is not claiming that Nu-Car should have been required to do something prohibited under the NLRA, appellant's claim should not be preempted by that act.

## IV. FRAUD CLAIM DOES NOT FAIL AS A MATTER OF LAW

Appellee's final argument is that Nu-Car's representations during negotiations with Varnum could not have been fraud as a matter of law. Appellee contends that prior to appellant's accepting employment with Nu-Car, the first-in-first-out dispatch system was in effect and Nu-Car could not have predicted with any certainty that the union and Nu-Car would agree on the proposed change to the seniority-based system.

■ The evidence was uncontroverted that the dispatch system in effect during the employment negotiations was not seniority-based. However, there was deposition and affidavit testimony by Paul McAllister, the hiring representative for Nu-Car, indicating that at the time he negotiated with Varnum he knew of the company's plan to propose a change to a seniority-based system. The evidence thus shows

that, at the time Nu-Car's representative indicated to Varnum that drivers typically grossed $7,000 per month, he knew that the company was planning to propose a change to a dispatch system under which new drivers such as Varnum would earn substantially less. Under Florida law, this representation regarding what Varnum could expect to earn, in the absence of any disclosure regarding the impending change in the seniority system, could have been fraud. *See Hamlen v. Fairchild Industries, Inc.*, 413 So.2d 800, 801 (Fla. 1st Dist.Ct.App.1982). Whether or not the representation actually was fraud is an issue for the trier of fact to decide.

## V. CONCLUSION

For the reasons expressed above, the judgment of the district court granting summary judgment in favor of the defendant is REVERSED. This case is REMANDED for further proceedings.

HOFFMAN, Senior District Judge, concurring specially:

Daniel Webster once stated, "There is nothing so powerful as the truth, and nothing so strange."[1] This sentiment is particularly apropos in light of appellant's predicament. While I concur in the result reached by the court, I am compelled to express my concern that the scope of the majority's holding not be expansively interpreted. I concur on the grounds that, based on the affidavit of Paul McAllister, appellant's state law claim does not fail as a matter of law and that the state claim is not pre-empted by federal law.

### I.

Florida law is consistent with the general rule that an actionable misrepresentation must involve a false statement of a past or existing fact and not a promise to do something in the future. *Hamlen v. Fairchild Industries, Inc.*, 413 So.2d 800, 802 (Fla.

1. Edwin P. Whipple, *The Great Speeches and Orations of Daniel Webster*, 204 (1879). At the request of the government, Webster appeared

for the prosecution and made this comment in the prosecution's closing argument in the murder trial of Captain Joseph White.

1st Dist.Ct.App.1982); *Vance v. Indian Hammock Hunt & Riding Club, Ltd.,* 403 So.2d 1367, 1371 (Fla. 4th Dist.Ct.App. 1981). However, Florida law recognizes several exceptions to this rule. First, "a promise is actionable as fraud only when the promisor had a positive intent not to perform his promise, or made the promise without a present intent to perform it." *Bissett v. Ply-Gem Industries, Inc.,* 533 F.2d 142, 145 (5th Cir.1976); *Perry v. Cosgrove,* 464 So.2d 664, 666 (Fla. 2d Dist.Ct. App.1985). Second, projections, opinions or representations of future profits or business success when made by a party with superior or exclusive knowledge of the underlying facts can constitute fraud when the "defendant knew or should have known, that the facts in his possession invalidated the opinion which he expressed." *Bissett,* 533 F.2d at 146 (applying Florida law of misrepresentation to allegedly false statements made to induce plaintiff to enter franchise agreement); *cf., Day v. Avery,* 548 F.2d 1018, 1025–28 (D.C. Cir.1976), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977) (generally discussing actionable misrepresentations involving statements of prospective returns made in order to induce those with inferior knowledge to enter into agreement).

Because projections of future performance are subject to the uncontrollable economic influence of the marketplace, such projections are generally considered expectations or predictions and not ironclad guarantees, regardless of their persuasive effect. *Kelly Tire Service, Inc. v. Kelly-Springfield Tire Co.,* 338 F.2d 248, 253 (8th Cir.1964). Clearly, however, presentation of false projections of business performance would fall within actionable misrepresentation under Florida law as a false statement of past fact. Further, substantial discrepancies between profit and loss statements presented to induce plaintiff to enter into a franchise agreement and the actual performance records of other franchises may reasonably support the inference that the defendant had knowledge of facts which would prevent the attainment of the projections. *Bissett,* 533 F.2d at 148.

This case does not involve conduct as egregious as the intentional manipulation of representations of projected revenues in order to overstate income. During the 20–odd meetings during the month of May, McAllister accurately represented to Varnum the existing terms of employment which governed his employment from June 2, 1983 (date of employment) to July 13, 1983 (date of implementation of the seniority based dispatch system). Throughout this one and one-half month period, appellant 1) was dispatched on a "first in-first out" system, 2) remained home-based in Jacksonville and 3) earned revenues comparable with the projections. McAllister's statements did not become inaccurate until the change in the collective bargaining agreement on or about June 26, 1983, at which time appellant was a Nu-Car employee and a provisional member of the union. Presumably, at this juncture any complaint by Varnum involving the change in dispatch system should have been brought pursuant to the grievance procedures established in the collective bargaining agreement. It should be noted that during the collective bargaining negotiations, as a response to Nu-Car's desire to reduce the cost of employee health care and pension benefits, the union, and not Nu-Car, initiated the suggestion to change the dispatch system. Further, in most instances it would be difficult to attribute a quantifiable degree of knowledge of a possible change in the collective bargaining agreement to an employee not involved in the bargaining sessions. Consequently, under these circumstances, summary judgment would appear proper because the misrepresentation claim would fail as a matter of law and the collective bargaining agreement would afford a remedy.

Florida courts have been reluctant to grant summary judgment when fraud or misrepresentation is involved. *Elmore v. Vatrano,* 485 So.2d 888 (Fla. 1st Dist.Ct. App.1986). The court in *Elmore* noted at 890:

Summary judgment is not a substitute for a trial; and fraud is a subtle thing requiring full explanation of the facts and circumstances of the alleged wrong to determine if they collectively constitute fraud. Since the whole context is necessary for the determination, it is seldom that one can determine the presence or absence of fraud without a trial. *Alepgo Corp. v. Pozin,* 114 So.2d 645 (Fla. 3d Dist.Ct.App.1959).

If the statements made by McAllister during May concerning the terms of Varnum's employment were made with actual knowledge of the fact that the dispatch system was to be changed or that Nu-Car intended to engage in a course of conduct which would prevent the realization of the representations made to Varnum, then the state tort action accrued when the statements were made and prior to the employment relationship. Consequently, viewing the facts in a light most favorable to appellant, there exists some doubt as to the extent of McAllister's knowledge during the month of May of the certainty of the change to the seniority based dispatch system. Particularly, I rely on the statement in McAllister's affidavit dated April 11, 1985, to the effect that McAllister was aware of discussion within the company concerning a shift to the seniority system and that he did not disclose this information because he was under pressure to hire a certain number of owner-operators.

Although there is no affirmative duty in Florida to disclose possible future changes in the terms and conditions of employment, an employer may not represent terms of an employment agreement when the employer has a present intent not to perform the terms under the agreement, or has knowledge of facts which will prevent the bargained for agreement from being performed. Because there is some evidence which suggests that Nu-Car may have had either the intent not to employ appellant under the bargained for terms or knowledge of facts which would materially alter what was represented to appellant, the state law claim does not fail, but should be resolved by the trier of fact.

## II.

The close question in this case is whether Section 301 pre-empts appellant's state law claim. The court below ruled that because the terms of appellant's employment were specifically addressed in the collective bargaining agreement, his proper remedies were under the contract grievance procedure and 29 U.S.C. § 185 (Section 301), and that Section 301 pre-empted the state law claim. In reversing the district court, I am concerned that the opinion not be broadly construed to open the floodgates to a myriad of state law actions in an area where federal law is paramount. The holding does not chip away at the pre-emptive effect of Section 301, but rather, on its particular facts falls outside of the established parameters of Section 301.

I do not believe that permitting appellant's state law claim to proceed would be inconsistent with these established parameters. "Pre-emption cases in the labor area are often difficult because we must decide the questions presented without any clear guidance from Congress." *Belknap, Inc. v. Hale,* 463 U.S. 491, 523, 103 S.Ct. 3172, 3190, 77 L.Ed.2d 798 (1983) (Brennan, J., dissenting). Thus, "[t]he full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis." *Allis-Chalmers v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 1916, 85 L.Ed.2d 206 (1985). The novel facts present here test the scope of the pre-emptive effect of federal labor law by questioning whether the employment relationship incorporates all statements made by an employer, even if the employee has not yet been formally employed. In *Teamsters Local v. Lucas Flour Co.,* 369 U.S. 95, 103, 82 S.Ct. 571, 576, 7 L.Ed.2d 593 (1962), the Court stated:

> The dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute. Comprehensiveness is inherent in the process by which the law is to be formulated under the mandate of [*Textile Workers Union*

*v.*] *Lincoln Mills* [353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)] requiring issues raised in suits of a kind covered by § 301 to be decided according to the precepts of federal labor policy.

More recently in *Lueck*, 471 U.S. at 210–11, 105 S.Ct. at 1911, the Court echoed the principle of *Lucas Flour*, when it noted:

> If the policies that animate § 301 are to be given their proper range, however, the pre-emptive effect of § 301 must extend beyond suits alleging contract violations. These policies require that 'the relationships created by [a collective bargaining] agreement' be defined by application of 'an evolving federal common law grounded in national labor policy.' *Bowen v. United States Postal Service*, 459 U.S. 212, 224–225, 103 S.Ct. 588, 596, 74 L.Ed.2d 402 (1983).

The Court suggests the pre-emptive effect be paramount in the area covered by the statute, but recognizes that not every dispute involving a collective bargaining agreement is necessarily pre-empted. *Id.*

The district court relied heavily on *Eitmann v. New Orleans Public Service, Inc.*, 730 F.2d 359 (5th Cir.1984), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984), in granting summary judgment. In *Eitmann*, defendant New Orleans Public Service, Inc. (NOPSI) explained prior to employing plaintiff that, because of the hazardous work conditions, plaintiff would receive full compensation during periods of disability caused by work related injury. Upon discharge as a result of an on-the-job injury, plaintiff brought suit, not upon the collective bargaining agreement between his union and NOPSI, but on an alleged breach of an independent agreement between himself and NOPSI, which included the agreement to pay full compensation. The Fifth Circuit ruled that the breach of contract claim was subsumed

in the terms of the collective bargaining agreement, because the collective bargaining agreement provided for a grievance procedure for discharged employees claiming unjust dismissal. *Id.*, at 363. The court concluded that the collective bargaining agreement governed the avenue of remedy since plaintiff sought "redress for a grievance awardable by the arbitrator." *Id.*, at 364.

Appellant's claim in this case focuses upon the conduct of Nu-Car prior to signing the Leased Equipment Agreement on June 2, 1983, at which time he became an owner-operator. Unlike *Eitmann*, appellant's complaint centers upon representations of the terms of employment made by the employer which the employer allegedly knew were not true, and not a failure by the employer to adhere to established terms of the collective bargaining agreement. The difference in these circumstances is that here the wrong was committed prior to the employment relationship, while in *Eitmann* the wrong occurred when NOPSI allegedly failed to pay full compensation.[2] Therefore, in *Eitmann* the grievance procedure anticipates resolution of conflicts when parties to the collective bargaining agreement fail to perform under the established terms, but here arbitration is inadequate because the alleged misrepresentation involves conduct which does not arise under the terms and conditions of the collective bargaining agreement.

"The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen could not wholly anticipate." *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960). In *Republic Steel v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), the Court rejected re-

---

**2.** This is not to say that I perceive § 301 to pre-empt state law actions only when breach of contract is involved. Rather, as the Supreme Court recently noted in *Allis-Chalmers Corporation v. Lueck*, 471 U.S. 202, 212, 105 S.Ct. 1904, 1912, 85 L.Ed.2d 206 (1985), "In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to pre-

empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." However, rejecting the state law bad faith handling of an insurance claim, the Court in *Lueck* determined that evaluation of that state law tort was inextricably intertwined with consideration of the terms of the labor contract and, therefore, was pre-empted by Section 301.

spondent's argument that because he had been discharged, the employment relationship had terminated and state law applies. While the Court intimates that the relationship continues after employment has terminated, the Court's holding is justified because it prevents a disgruntled, discharged employee from sidestepping the available grievance procedure and undermining the method for orderly settlement of employee grievances. *Id.* at 653, 85 S.Ct. at 616. However, despite the apparent breadth of the employment relationship under a collective bargaining agreement, I remain unconvinced that this collective bargaining agreement would encompass the activity complained of here and that the grievance procedure set out in the agreement would adequately redress the alleged harm. By not extending the employment relationship to include representations made by the employer to prospective employees, we do not undermine the established parameters of Section 301 because the alleged wrongful activity deals with misrepresentation of the terms of the collective bargaining agreement and not the change in the terms of the labor contract resulting from the negotiations between Nu-Car and the Union.

The Supreme Court also acknowledges an exception to the rule of uniform labor policies when the state claim is "of only peripheral concern to the federal law or touches interests deeply rooted in local feeling and responsibility." *Belknap,* 463 U.S. at 498, 103 S.Ct. at 3177. In *Belknap,* replacement employees, who were promised permanent employment in filling the position of striking employees, brought suit against the employers for breaching the

representation of permanent employment when the striking employees were subsequently rehired. Consistent with other cases which address claims tangentially related to national labor policy, the Court permitted the state law claim to proceed because "maintaining the misrepresentation action would not interfere with the [National Labor Relations] Board's determination of matters within its jurisdiction ..." and the state "surely has a substantial interest in protecting its citizens from misrepresentations that have caused them grievous harm."[3] *Id.* at 511, 103 S.Ct. at 3183. Here, adjudication of the state law misrepresentation claim will not jeopardize uniform determination of national labor policy, because the claim is only of peripheral concern to the federal regulatory scheme, and will afford relief for an interest protected in local feeling.

---

**3.** The Court in *Belknap, Inc. v. Hale,* 463 U.S. 491, 509–10, 103 S.Ct. 3172, 3182–83, 77 L.Ed.2d 798 (1983), supports this proposition based on a line of cases which follow from *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), by citing *Linn v. Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (false and malicious statements which were injurious to reputation actionable under state law not pre-empted even if an unfair labor practice); *Farmer v. Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) (intentional infliction of emotional distress not pre-empted although conduct might arguably have constituted an unfair labor practice); *Sears, Roebuck & Co. v. Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) (state trespass action not pre-empted because it concerned objection to location of the picketing and not the picketing itself). In *Eitmann v. New Orleans Public Service, Inc.,* 730 F.2d 359, 364 (1984), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984), the Fifth Circuit approvingly cites the same cases as those above and adds *Franchise Tax Board of the State of California v. Construction Laborers Vacation Trust for Southern California,* 463 U.S. 1, 25 n. 28, 103 S.Ct. 2841, 2854, n. 28, 77 L.Ed.2d 420 (1983) (dictum suggesting battery suit arising from a violent strike not pre-empted).