In re Daniel L. FIRESTONE, Debtor.

Donald Y. McMILLAN, Nancy Jean Ankenman, Douglas H. Dabney, Jack Lee, Homer Forsythe, and Jane Forsythe, Plaintiffs.

v.

Daniel L. FIRESTONE, Defendant.

Bankruptcy No. 81–01715–BKC–JAG.
Adv. No. 82–0016–BKC–JAG–A.

United States Bankruptcy Court,
S.D. Florida.

Aug. 18, 1982.

(14th. ed. 1975).

Phillip D. Cameron, Worthington, Ohio, Ronald J. Rothschild, Hollywood, Fla., for plaintiffs.

Arthur Halsey Rice, c/o Leibowitz & Rice, Miami, Fla., Gary J. Rotella, c/o Frank Joseph Heston, P.A., Tamarac, Fla., for debtor-defendant.

JOSEPH A. GASSEN, Bankruptcy Judge.

### FINDINGS AND CONCLUSIONS

This matter was tried on the joint complaint to determine dischargeability of debt under 11 U.S.C. § 523(a)(2)(a). The complaint is predicated on the fraud involved in inducing each of the plaintiffs to purchase a film distributorship from the debtor's corporation, Firestone Photo Co. Only one complaint was filed and one trial held. Although each plaintiff independently entered into a contract with Firestone Photo, and the possible misrepresentations to and reliance by each plaintiff must be considered separately by the court, many of the facts as to each are relevant to the others because they demonstrate the routine business practices and the knowledge of Firestone Photo and of the debtor.

At trial ruling was reserved on certain evidence. That part of the testimony of Harry B. Kenyon which was made only by way of proffer is admitted because it was not character evidence as to the debtor, but was information about the photo processing industry and the Firestone company's operations. The evidence is relevant to the truth or untruth of representations that were made to the plaintiffs and to the

knowledge of the debtor as to the truth of such representations, both of which are elements under § 523(a)(2)(a). Plaintiff's Exhibits No. 56A, 57A, 58A, 59A, 60A, 61A, 62A, 66A and 67A, all marked for identification only, will not be admitted because they have insufficient relevance to the specific fact issues in this case. Exhibit No. 63, Entry of Guilty Plea, is now admitted for the purpose of proving the debtor's knowledge of the actions of his sales agent, which became relevant upon the testimony of Daniel Firestone that a sales representative whose actions led to the Entry of the Guilty Plea in 1975 visited plaintiff McMillan in 1976.

## FACTS

The only witnesses were the five plaintiffs, the defendant and Kenyon. (Jane Forsythe, a co-plaintiff with her husband, did not testify.) Because of the seriousness of the effect on the debtor's rehabilitation if plaintiffs should prevail, and because of the high emotion surrounding the fraud issue, the court has very carefully considered the demeanor and credibility of each witness and has examined the documentary evidence in detail. Based on the foregoing, the court makes the following fact findings.

In 1946 in Columbus, Ohio debtor-defendant, Daniel L. Firestone, founded his company, Firestone Photographs, which he incorporated in approximately 1965. Around 1975 he formed a second corporation, Firestone Photo Co. Firestone was originally a commercial photographer and gradually expanded into photo processing and related business. He solely owned, controlled, and directed the business activities of both his corporations. He testified that one was a distribution and sales company and the other handled film processing, but the evidence suggests that their identities may not have been kept entirely separate. Firestone testified that he sometimes used corporate funds to pay personal expenses.

In late 1973 Firestone Photographs began selling distributorship franchises essentially similar to the ones which gave rise to this complaint. The distributors would purchase from Firestone rack displays with Kodak film, which were placed in stores and serviced by the distributors. To the Kodak film, Firestone attached its processing mailer, so that the store customer would pay for both the film and the Firestone film processing at the time the film was purchased.

Kenyon, a former vice-president of Firestone Photographs who was familiar with the operations of the company testified about the inception of Firestone's franchise sales program. Daniel Firestone initially asked Kenyon to get information about a competitor's program, which Kenyon did in 1973. Despite Kenyon's unfavorable report, Daniel Firestone decided that such a program should be set up by Firestone Photographs. From Kenyon's prior experience with prepaid processing, he was convinced that the program would not work because processing adds so much to the initial price that most customers prefer to buy film alone and pay for the processing later separately, leading to low sales for film which is sold together with prepaid processing. The slow sales led to film becoming outdated and because of all of this it was difficult to find outlets which would take the racks of film. Kenyon testified that the Firestone company itself had tried to sell the prepaid film and mailers previously and was unsuccessful. Nevertheless, Daniel Firestone personally decided to go ahead with it as a franchise program, and he adopted many of the competitors' materials which Kenyon had obtained.

In his discussions with Daniel Firestone at that time, one contract provision which Kenyon particularly objected to was the repurchase guarantee because he felt it would be impossible for the company to comply with that term, because of the likelihood of unsuccess of the distributorships. Kenyon also objected to the profit projection which was included in the promotional materials, first of all because it was based on Kodak figures as to the sale of film alone, not film with prepaid processing, and secondly because he felt that the sales projections were totally arbitrary. Daniel

Firestone told him that the figures for projected number of sales for each distributor were average figures, but did not have any data to back them up.

Kenyon further objected to the list of prospective sales outlets included in the promotional materials because Kenyon felt there was no reason to believe that the film with Firestone processing mailers could be placed in these types of outlets. He himself spoke to representatives of the Kroger Supermarket chain and they would not even consider taking the Firestone displays.

Finally, based on his observation of company operations and his discussions with Kodak representatives and other persons in the photographic field, he concluded, after making several franchise sales, that the program would also be unsuccessful because of poor service. Firestone was taking three to four weeks to return processed film while their competitors were giving two day service, and the company did not have the cash flow to handle it more quickly.

Kenyon testified that he discussed the deficiencies of the program with Daniel Firestone on at least six occasions, but Firestone informed him that his job was just to sell the franchises. Kenyon did sell seven franchises before he left the company in February, 1974. Before he left however, the purchasers "badgered" him about their dissatisfaction because their sales outlets turned out to be "Mom and Pop" locations and they were getting very few film sales. Two of the seven asked for their money back under the repurchase agreement and Daniel Firestone "avoided" returning it. All were eventually involved in litigation.

Following Kenyon's departure, the Firestone companies continued selling distributorships. The debtor testified that the companies employed about three hundred persons in 1976 and that they were doing a lot of business. The evidence shows that there was national advertising for the sale of the franchises. Plaintiffs in this case signed distributor agreements with Firestone Photo Co. on the following dates: McMillan (Georgia)—January 26, 1976, Dabney (Virginia)—February 3, 1976, Lee (Ontario,

Canada)—September 27, 1976, Forsythes (Ohio)—August 5, 1977 and Ankenman (Indiana)—August 29, 1977 (Plaintiffs' Composite Exhibits No. 3, 4, 37, 1, and 5). (Lee originally signed an agreement on September 27, 1976 and then entered into a new agreement on October 7, 1976 when he was given a different territory.) (Plaintiffs' Composite Exhibit No. 6).

In November, 1977 a fire occurred which Daniel Firestone testified caused serious interference with the processing of film by Firestone Co. Each of the plaintiffs eventually obtained undefended judgments in state or federal court against the Firestone companies and Daniel Firestone (Plaintiffs' Exhibits No. 16, 17, 18, 19 and 48). At some time subsequent to the events complained of the debtor moved to Florida, and he filed a petition in bankruptcy under chapter 7 on October 21, 1981. The companies are out of business but Firestone testified that they did not file bankruptcy because of the expense of legal representation.

The processes by which each of the plaintiffs became involved with Firestone were basically similar. Each plaintiff saw one or more newspaper advertisements seeking a distributor for "world famous Kodak film and other photo products" (Plaintiffs' Exhibit No. 7). Plaintiffs each responded to the advertisement and soon received a visit from a sales representative. A promotional packet with items such as an estimated profit projection for the distributorship, a list of types of locations where the film racks would be placed, photographs of the Firestone Co. buildings and processing equipment, Kodak sales brochures, and copies of newspaper articles about Daniel Firestone, franchising, and the photographic industry, as well as a cover letter from Daniel Firestone, were either mailed prior to the visit of the sales representative or were brought with him on his visit to the plaintiff (e.g., Plaintiffs' Composite Exhibit No. 5).

In most cases the sales representative appeared unexpectedly, often on the weekend. High pressure sales tactics were used, including the representation that a decision

must be made quickly (within a day or two) and that other customers were waiting to snap up the distributorships. Mr. and Mrs. Forsythe drove to the Columbus headquarters and talked with Daniel Firestone before signing the agreement; none of the others spoke directly to the defendant.

In each case the salesmen made representations to the effect that Firestone Photo Co. and/or its franchise program was rapidly growing, expanding and successful, having many other successful distributors, doing a multimillion dollar business. It was represented that a distributor's success would depend only on his own hard work and that the purchaser's profit for the first year would approximately equal the investment. McMillan was told that he would make $100 per week; Dabney that he would earn $5,200 in the first year, or being very conservative, $4,600; Lee that he would earn $4,000 per year; and Ankenman, $5,000 per year. They were told that the distributorship would be repurchased from them after one year if they were not satisfied, and such a clause was included in the contract.

The plaintiffs were all assured that the Firestone film racks were placed in high volume, high traffic, "quality" stores, and that the ten or twelve locations each was to receive under the franchise agreement would be of this quality. Mrs. Ankenman was told that her locations would probably be Kroger Supermarkets and Super X Drug Stores. Dabney was told it would be big supermarkets. McMillan was told that the representative had reviewed the Brunswick, Georgia area, which was to be his territory, and that the locator would be able to find ten good locations in half a day. It was represented that the job required no selling or soliciting and that the locations would be found for them.

Plaintiffs were told that Firestone Photo Co. was a reliable, well established company, run by Daniel Firestone, who had been in business a long time and had worked his way up from one camera, and that they could have similar success. They were told that film processing would be fast ("as fast as the mail") and service good. Lee's territory was in Ontario, Canada. Since he was concerned both about receiving good service and about the prejudice many Canadians feel about American companies, he made specific inquiries of the sales representative and was told that Firestone had a warehouse and lab in Toronto and that processing would take no more than a week. He did not find any such business operation listed in the phone book so he called company headquarters in Columbus and was told that no telephone listing was needed (film mailers were returned to a P.O. Box in Toronto) and that Lee could be told the phone number only after he was a distributor himself.

While the salesmen made their pitches, they spread out Kodak promotional materials and sales and product literature. Lee questioned the sales representative because he was involved in photography himself and had never heard of the Firestone company. He was told that Firestone Photo was a selling agency for Kodak. McMillan was told, "Kodak is backing Mr. Firestone and they are interrelated." Mrs. Ankenman inquired about the relationship and received neither a yes or no answer; she was told that the personnel were Kodak trained and Kodak film was used. Plaintiffs were told that they would receive the benefit of $50,-000,000 worth of Kodak national advertising.

Each of the plaintiffs was told that they would receive their supplies and the locator would come to find the sales locations and set up the racks within a week or a very short period of time. Kodak brochures showed racks of film and mailers which were to illustrate what they would receive. The supplies were to be delivered to them directly. McMillan and Dabney each asked for an allocation of the purchase price and were given a specific (though differing) amount as the cost of supplies which they would receive.

The events which actually occurred differed in major respects from what the plaintiffs had each been led to expect. In almost every instance the supplies were late

and were incomplete according to the list of items they were to receive. Ankenman and Lee had to drive fifty or sixty miles to pick up their supplies. When they received price lists and could calculate the costs of the items they were to receive initially under the agreement, McMillan and Dabney both found that the value was not equal to the sales price allocation made by the sales representatives.

Dabney and Lee both testified that the racks which were received were entirely different from and inferior to those which had been shown in the sales materials. The ones received were not plastic free-standing units but were cheaper looking wire racks which were intended to be attached to peg boards, and were of inherently less utility because they could only be used in stores which had facilities for hanging them. Lee also testified that the mailer envelopes differed from what had been represented in that they had poor quality printing and would raise customer doubts about the quality of film processing by a company which provided such mailers.

The locators were even more late to arrive than the supplies, except in the cases of Ankenman and McMillan where the film had not arrived by the time the locator was there and the plaintiffs had to set up the displays themselves later. Plaintiffs each had to spend about two days driving the locators around, sometimes over several hundred miles, trying to find stores which would accept the film displays. They uniformly testified that the results were very disappointing. They were often rural locations, a one-pump gas station, small beverage stores, shabby retail stores, and an occasional card shop or convenience store. Based on the salesmens' representations, McMillan had prepared a list of potential locations in his area but when the locator arrived, he told McMillan that it was a waste of time to look at supermarkets because they would not accept the displays, and the locator knew of *no* drug stores which had taken the film displays. Dabney's locator told him that they could not get into high-traffic locations.

Defendant attempted to cast doubt on the credibility of the plaintiffs' present analysis of the locations by showing that most had signed acceptances of locations or had written letters favorable to the locators (Defendant's Exhibits B, C, D, and H). The plaintiffs, however, testified that the locators told them they would lose their job, or not be paid, or otherwise suffer dire consequences if they could not produce a letter showing that they had done their jobs satisfactorily. Because the plaintiffs felt sorry for the individual locators and because they were not experts in film marketing and thought that the locators might know better than they, they wrote the letters. In at least one instance the contents were dictated by the locator. An examination of these exhibits reveals that they tend to damn with faint praise or commend the attempts by the locator without reference to the locations themselves.

Lee and Ankenman testified that they were told a further investment was needed either for a better territory or for the minimum necessary supplies, but the evidence was not clear or sufficient enough for the court to conclude that it was part of the practice of the company to try to obtain additional moneys after the contract had been signed.

Each of the plaintiffs soon learned that business was very poor. Many locations had no sales at all and others had very few. Some of the stores went out of business themselves and several asked for removal of the displays because of low or no sales of film. Three of Mrs. Ankenman's locations cancelled their agreement with her before the racks were ever installed, because of the long delay she experienced in receiving her supplies. Forsythe had $56 worth of sales in the first three and one-half months (as opposed to the projected $338 per month) and sales "went downhill from there." McMillan had approximately $1,000 worth of sales in twelve locations in fifteen months, and netted nothing. Mrs. Ankenman had gross sales of $118 over a five to six month period and netted about $20 total. Lee testified that his sales were poor,

not worth the price of his gas. Dabney had almost no sales so he looked for additional better locations himself and obtained some, but still could make no sales. Lee made several suggestions to the company for improvements which could increase sales but got no response so he prepared signs and advertising himself, and eventually resorted to selling his inventory at less than cost.

The plaintiffs also soon learned that service was terrible as well. Film customers complained about slow processing and some of the distributors experienced it in sending in their own film for processing. It generally took a month to process a film but Lee had some which took three months. After the early delays he suspected that there was no lab in Toronto as he had been told, but upon his inquiries to personnel in Columbus, he was continually told that there *was* Firestone film processing in Toronto, until the film was returned post-marked in Columbus. Film was lost, and both the film developing and printing were of poor quality. The distributors were supplied with outdated film or film which became outdated very quickly because of the lack of sales. Upon customer inquiry, Mrs. Ankenman examined her film and discovered that all of it had two price tags, one on the front and one carefully placed over the film expiration date. Reorders of film by the distributors took up to three months. Defendant argued that the difficulties in film processing were caused by the fire which occurred unexpectedly after plaintiffs had entered into the distributorship agreements. However, the evidence is clear that the earliest of the contracts in evidence in this case was entered into almost two years before the fire, and all of the plaintiffs were having problems with the Firestone companies prior to the fire.

## LAW

■ The debtor's liability to the plaintiffs was determined and fixed in the judgments obtained by them. However, the courts issuing those judgments were not applying bankruptcy law, and therefore this court will look behind those undefended judgments to examine the facts in light of the Bankruptcy Code. See *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). And because it is applying federal bankruptcy law this court need not look to the state law of each state where the various transactions with the defendant occurred.

■ Under 11 U.S.C. § 523(a)(2)(A) an individual will be denied discharge from any debt "for obtaining money, property, services . . . by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." This section is derived from § 17a(2) of the prior Bankruptcy Act, 11 U.S.C. § 35(a)(2). Although the phrase "or actual fraud" was added to § 523, this phrase merely codifies prior case law. *Thomas v. Turner, In re Turner,* 12 B.R. 497, 7 B.C.D. 1119 (Bkrtcy.N.D.Ga. 1981). Case law construing § 17a(2) is therefore applicable to the determination of issues under § 523(a)(2)(A). *Fournet v. Miller, In re Miller,* 5 B.R. 424, 2 C.B.C.2d 849 (Bkrtcy.W.D.La.1980).

■ The five elements of a non-dischargeable fraud under § 523(a)(2)(A) are that "(1) the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made" *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540, 543 (W.D.Va.1967). Also, e.g., *Public Finance Corp. of Redlands v. Taylor, In re Taylor,* 514 F.2d. 1370, 1 B.C.D. 886 (9th Cir.1975); *Fournet v. Miller, supra.* The court concludes that the plaintiffs have met their burden of proving each of the elements.

### Personal Liability

■ Initially we must decide the issue of whether Daniel Firestone's personal liability can be such as to deny him discharge from these debts which arose primarily from plaintiffs' transactions with other cor-

porate employees. Although the money (in payment for each distributorship) was obtained for one of Firestone's corporations, the "better view" is that it is not necessary that the property be actually procured for the debtor himself. 3 Collier on Bankruptcy, 15th ed., ¶ 523.08[1] at n. 4, and cases cited therein.

 The debtor met personally with the Forsythes, and essentially ratified what the Forsythes had been told by other company employees. In each of the other cases the plaintiffs had no direct contact with Daniel Firestone. However, an officer, director or shareholder of a corporation will not be shielded by the corporate form from liability for a tort, including fraud, in which he himself is involved. The rule is summarized in *Lobato v. Pay Less Drug Stores, Inc.,* 261 F.2d. 406, 408–9 (10th Cir.1958):

> It is the general rule that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom. But merely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation. Specific direction or sanction of, or active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party is necessary to generate individual liability in damages of an officer or agent of a corporation for the tort of the corporation.

Also, e.g., *L.C.L. Theatres, Inc. v. Columbia Pictures Industries, Inc.,* 619 F.2d. 455 (5th Cir.1980) (fraudulent underreporting of box office receipts); *United States v. Amrep Corp.,* 560 F.2d. 539 (2d. Cir.1977), *cert den.,* 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d. 759 (fraud); *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d. 902 (1st Cir.1980) (personal injury); *A & M Records, Inc. v. M.V.C. Distributing Corp.,* 574 F.2d. 312 (6th Cir.1978) (unfair competition). In *Solo Cup Co. v. Paper Machinery Corp.,* 359 F.2d.

754 (7th Cir.1966) the court found that the president of a company who initiated a project to duplicate a competitor's machine, who arranged for the employment of the competitor's engineer, and who negotiated a contract with a supplier in anticipation of the new machine "was an actual participant in the tort [of unfair competition], and therefore, liable". In the case here, Daniel Firestone initiated the franchise program, continued with it despite initial negative reports, and told Kenyon he would run it himself. The different sales representatives who visited each of the plaintiffs made almost identical representations, leading to the conclusion that these representations were part of an overall plan, not representations that the salesmen may have made beyond the scope of their authority. Further supporting that conclusion is the evidence that the plaintiffs who visited company headquarters, or, like Lee, called to verify the existence of the Toronto lab, received affirmations of the misrepresentations made by the salesmen in the field. It strains credulity to conclude that these were not all authorized or directed from top levels in the company, specifically including Daniel Firestone.

Firestone testified that he approved the materials provided to potential franchisees and he signed the letter sent to them. While it may not have been seen by all the plaintiffs prior to execution of their contracts, and therefore could not have been relied upon by those individuals, it is evidence of his participation and approval. Firestone not only was the owner of the companies, but he also controlled the business operations. The evidence both of numerous specific acts of participation by the debtor and of his overall control of the operation, leading to the inference of further involvement, makes it clear that personal liability is proper here.

This finding of liability on the part of an individual defendant is made on a different legal basis from that of piercing the corporate veil. Although Firestone was the sole shareholder, there is no need to disregard the corporate entity to find him personally

liable. In *Donsco, Inc. v. Casper Corp.,* 587 F.2d. 602, 606 (3rd Cir.1978) Casper Pinsker was a shareholder and "the central figure", as well as an officer of the corporation. The court stated:

We hold that Casper Pinsker is liable as a participant in a wrongful act. This liability is distinct from the liability resulting from the "piercing of the corporate veil" as that term is commonly used. The effect of piercing a corporate veil is to hold the owner liable. The rationale for piercing the corporate veil is that the corporation is something less than a bona fide independent entity. Pinsker is liable here as an actor rather than as an owner. His liability is in no way dependent on a finding that Casper Corporation is inadequately capitalized, that the corporation is a mere alter ego of Pinsker, that the corporate form is being used to perpetrate a fraud, or that corporate formalities have not been properly complied with.

This principle of individual liability has been applied in a case denying discharge of a debt in bankruptcy. *Seaver v. McGrath, In re McGrath,* 7 B.R. 496 (S.D.N.Y.1980) It is appropriate that it apply to prevent discharge of a debt under § 523(a)(2)(A) under circumstances such as are present here.

*Misrepresentations and Knowledge of Falsity*

■ The first element plaintiffs must prove is that representations were made to them which were untrue. To find fraud, usually the representations must be ones of fact. However, two exceptions exist. Ordinarily a promise to perform in the future which is not carried out is actionable only in contract. But a promissor's intent, or mental state, is generally treated as a material existing fact, and if the promise was made with a positive intent not to perform or without a present intent to perform, or made where the promisor knew or should have known of his prospective inability to perform, the misrepresentations can be found to be fraudulent. E.g. *Bissett v. Ply-Gem Industries, Inc.,* 533 F.2d. 142 (5th

Cir.1976); *United States v. 1,557.28 Acres of Land in Osage County, Kansas,* 486 F.2d. 445 (10th Cir.1973). This exception has been applied specifically under § 523(a)(2)(A) as well. *Thomas v. Turner, supra.* See also *Strawbridge & Clothier v. Ciavarelli, In re Ciavarelli,* 16 B.R. 369 (Bkrtcy.E.D.Pa.1982).

■ Opinions also usually cannot be the basis for a finding of fraud. But declarations of predictions or opinion as to future events (specifically including anticipated profits) which the declarant does not in fact hold, or declarations made with reckless indifference for the truth, may be found to be fraudulent. *U.S. v. Amrep Corp., supra; Cameron v. Outdoor Resorts of America, Inc.,* 608 F.2d. 187 (5th Cir. 1979), on rehearing, 611 F.2d. 105 (5th Cir. 1980). Where an opinion is based "on facts that are unavailable to the listener either because he does not have access to them or because he is obviously incapable of interpreting them" it may be actionable. *Day v. Avery,* 179 U.S.App.D.C. 63, 548 F.2d. 1018 (1976), *cert. den.* 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d. 394; *Bissett v. Ply-Gem, supra.*

■ The scienter element, which in application is usually intertwined with the falsity element, requires that the representations made must have been known to be false or were made with reckless disregard for the truth amounting to willful misrepresentation. *Houtman v. Mann, In re Houtman,* 568 F.2d. 651 (9th Cir.1978).

The facts of cases in which courts have applied the fact/opinion exceptions are instructive. In *Ply-Gem* the purchasers of a retail franchise sued the franchisors, claiming fraud in the representations made to induce them to purchase. The circuit court held that the following representations, among others, were properly the basis of fraud: "that the number of franchise outlets, which defendants from time to time proclaimed as evidence of their growth and of the profitability of a Ply-Gem franchise, showed a straight line upward increase in store units;" that defendants "would assist in selection of a site for the business of Plaintiffs and from which in the knowledge

and experience of Defendants the site would be profitable;" "that all Ply-Gem panel centers were profitable, and in reliance thereon the Plaintiffs would anticipate a profitable and successful career as a Ply-Gem franchisee;" and "that Tampa could support a warehouse distribution center and that Plaintiffs could realize added profits by opening one immediately." The evidence was sufficient to show that defendant's franchises were much less profitable than represented, that the defendants knew or should have known this at the time the representations were made to plaintiff, and that because of defendant's superior knowledge of their own past operations, all of these opinions constituted fraud.

In *Cameron* the defendants were selling condominium campsites. Owners of the campsites could rent them out while they were not in residence. This was the second such camp which defendants had developed. To induce the purchase, the national sales manager of the corporate defendant prepared a statement of projected cash flow which was shown to prospective purchasers. It stated that owners could anticipate an 80% occupancy rate and each campsite would produce $5.00 per day, even though corporate officers knew that there was no factual basis to estimate occupancy or rent. Given the superior knowledge of the defendants, the court held that the representations were fraudulent because of the defendants' negligence in making such representations "with admitted inward skepticism".

*Amrep* involved land sale fraud. Purchasers were told that defendants' development was in an area of necessary expansion in Albuquerque and that they could make up to 25% per year on a land investment there. Defendants also took as examples sales from "dissimilar" property, applied principles of financial leverage, and showed that purchasers might realize annual gains of 150%. Although the written materials also made a reservation that "resale for a profit might be difficult for a number of years", the court held that there was sufficient evidence that the defendants, including the individuals, knew or could have known by the exercise of reasonable diligence that the representations were false so that the jury could have concluded that the statements were not beliefs honestly held, but were fraudulent. The court noted that "[s]elf delusion, even if existent, does not justify baseless representations." 560 F.2d at 546.

▮ There were several knowing misrepresentations made to the plaintiffs in this case. First were the representations that the film would be placed in high traffic locations, supermarket or drugstore chain stores, Kroger stores, and similar "quality" locations. It was represented that these were the types of locations of existing distributorships as well as promises of future performance by the defendant. To the extent that they were promises, the evidence is more than sufficient to conclude that the defendant had absolutely no expectation that such promises could or would be fulfilled.

The second misrepresentations were as to the projected profitability of the distributorships, and the rate of return on investment. Although these were clearly opinions, they fall within the exceptions in the cases cited above. Defendant had superior knowledge which was not easily accessible, or, because of defendant's actions in promoting the fraud, not accessible at all to plaintiffs. To the extent that the plaintiffs could draw their own opinions as to projected profitability, their opinions were affected by other misrepresentations. For example, the untruthful information about locations would affect plaintiffs' judgments about the volume of business that could be expected and the expense of servicing the outlets (because the locations were often much more distant than had been promised). Likewise, the false representations about the quality of the film processing service would affect plaintiffs' ability to judge profitability.

The written profit projection which was provided was specifically fraudulent because it used information from a type of product (film *without* prepaid processing) with a completely different market. The

projection, (see, e.g. Exhibit No. 5) notes at the bottom "This projection is based on FILM WITH PROCESSING AND PROCESSING ONLY." The purpose of the note was to suggest that a distributor would realize even greater profits through the sale of equipment and supplies which were allegedly also available from Firestone. However, it shows that the projection purports to represent expected sales from film with processing, while Kenyon's unrebutted testimony was that the projection was compiled from information about sales of film *without* mailers, and that such film sells much more readily than the package Firestone was offering. Given the evidence of Kenyon's warning to Daniel Firestone at the inception of the program, the avoidance of repayment to even the earliest customers, the history of unsuccess of the distributorships by the time sales were made to these plaintiffs, the poor financial condition of the Firestone companies and the actual failure to repurchase from any of the plaintiffs, the court also concludes that defendant had no expectation of honoring the buy-back guarantee at the time it was made, and that, instead, it was merely part of the fraudulent inducement. Even if Firestone's commencement of the distributorship sales program was motivated more by an optimistic misinterpretation of the likelihood of success than by a knowing deception, by the time the sales were made to plaintiffs here, there can be no doubt that he knew of the falsity of the profit projections. A third and related misrepresentation was that there were numerous other successful distributorships at the time sales were made to plaintiffs. Although Firestone asserted that there were many, he was unable to give any other detail or documentary evidence. The court must conclude that this was a knowingly false statement.

A fourth type of false representation was made only to Lee. These were the statements about the Firestone lab and warehouse in Toronto, which had no basis in fact whatsoever.

A fifth misrepresentation was of a special relationship with Kodak. In some instances this may have amounted more to a "false pretense" than a false representation, in that the materials and sales presentations tried to create an aura which suggested Kodak involvement. In other cases there were specific statements of a business connection. The falsity and knowledge of falsity of these are self-evident.

Finally, there were a number of less significant misrepresentations, but which contributed to the fraud as a whole. The amount or value of supplies included in the purchase price and the quality of equipment to be provided were misrepresented to some plaintiffs. There was a representation that the distributorship required no selling or soliciting by the franchisee, while in reality each had to drive the locators around, and assist to some degree in soliciting locations.

Without detailing precisely which misrepresentations were made to each plaintiff, the court is satisfied that sufficient substantial false representations were made to each to satisfy the first element of § 523(a)(2)(A). And each such representation was made with the actual knowledge that it was untrue, or, at best, with such recklessness that the scienter element is satisfied.

*Intent*

The requisite intention may be inferred from other facts. "[W]here, as here a person knowingly or recklessly makes a false representation which the person knows or should know, will induce another to make a loan, intent to deceive may logically be inferred." *Carini v. Matera,* 592 F.2d. 378, 380 (7th Cir.1979). In fact, intent may be inferred despite the debtor's avowal to the contrary. *Wollman v. Gessler, In re Gessler,* 11 B.R. 489, 4 C.B.C.2d. 985 (Bkrtcy.W.D.Wis.1981).

The pattern of misrepresentations here, the similarity of statements to all plaintiffs, the persistence in continuing the deceit (as with the continued representation to Lee that Canadian film was being processed in Toronto), and the complete absence of any disclaimers by the sales representatives even though Firestone had received

complaints from others prior to the sales to plaintiffs here all contribute to the inference that the misrepresentations were made with the intent of deceiving the plaintiffs.

*Reliance*

 In some cases it is stated that the creditor's reliance must be reasonable. E.g. *Carini v. Matera, supra; Citizens & Southern National Bank v. Thomas, In re Thomas,* 12 B.R. 765, Bankr.L.Rep. (CCH) ¶ 68228 (Bkrtcy.N.D.Ga.1981). However, the Bankruptcy Court in the District of Connecticut, in *Mechanics and Farmers Savings Bank v. Fosco, In re Fosco,* 14 B.R. 918 (Bkrtcy.D. Conn.1981), takes the persuasive position that the purpose of § 523(a)(2)(A) of discouraging fraud and providing relief for victims would be impeded by the imposition of a reasonable reliance standard, and that the legislative history suggests that Congress did not intend to impose a reasonableness requirement in subsection (A). Under the Bankruptcy Code a reasonableness requirement was specifically added to the reliance element in excepting from discharge debts obtained by the use of a false financial statement (§ 523(a)(2)(B).) This was to prevent the practice of creditors obtaining leverage against debtors by inducing debtors to make false financial statements which the creditors could later use against them in bankruptcy. There is much less chance that this type of abusive practice can be used in non-financial statement cases. As stated in *Fosco:*

> The issue evolves into a balancing of equities. While conduct is generally measured against a standard of what is reasonable, here, the conduct of an arguably negligent creditor is being weighed against a debtor who committed an intentional wrong. Should a debtor, who because of a relationship of trust succeeds in deceiving another, benefit by the discharge of the debt which is the product of that deception at the expense of his victim? I think not and accordingly reject

the defendant's argument that a failure of the plaintiff to prove "reasonable" reliance on the defendant's misrepresentation entitles him to a discharge of the debt created by that deceit.
14 B.R. at 922

(It should be noted that although the court used the phrase "relationship of trust", the facts of the case show no greater relationship of trust than existed in the present case. The debtor, Fosco, was a customer of the creditor bank whom the bank supervisor "knew" and he induced the bank to accept a check with a forged endorsement.)

If reasonableness *is* implied as a requirement under subsection (A) despite the failure of Congress to insert such language, as it did in subsection (B), an examination of the cases supports the analysis in *Northern Trust Company v. Garman, In re Garman,* 643 F.2d. 1252 also printed at 625 F.2d. 755 (7th Cir.1980) *cert. den.* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d. 333. The court there stated [1]:

> These cases simply stand for the proposition that reasonableness is circumstantial evidence of actual reliance; that is dischargeability shall not be denied where a creditor's claimed "reliance" on a "financial statement" would be *so* unreasonable as not to be actual reliance at all.
643 F.2d. at 1256

The Garman Court also pointed out the danger that a court may slip into a review of a creditor's business judgment and second guess the soundness of the creditor's entering into the transaction, rather than keeping its focus on whether it was reasonable for the creditor to rely on the misrepresentations. Although a discharge of a debt may be permitted "when the creditor's reliance is so unreasonable as to be no reliance at all, ... the debtor whose conduct is fraudulent under section 523(a)(2)(A) should not be discharged from his fraudulent debt when his victim's conduct was merely less than prudent." *Fosco,* 14 B.R. at 923.

---

**1.** *Garman* involved a false financial statement but its reasoning is applicable to the resolution of a case under subsection (A). Although Garman was decided under § 17a(2), which did not include the reasonableness standard, the court examined decisions "ostensibly" requiring a showing of reasonableness.

This analysis of the reasonableness concept is logical because, if the court substitutes its seasoned judgment as the standard for reasonableness it would preclude recovery for the unintelligent, the gullible and the unsophisticated—the very people who are likely to suffer damage at the hands of others who intend to mislead them. Where a person has the intent to deceive and succeeds in that deceit to another's detriment, it serves no purpose to protect the deceiver from the consequences of his wrongdoing simply because someone smarter would not have been misled.

In this case the court concludes that there was reliance by plaintiffs as to most of the representations. Regarding an affiliation with Kodak, the court concludes that there was reliance only by Lee, who was told that Firestone Photo was a selling agency for Kodak. Although the advertisement which the plaintiffs responded to gave an overall impression of a relationship to Kodak, and although the sales representatives emphasized Kodak products, no direct statement of affiliation was made to any plaintiffs other than Lee and McMillan, and there were sufficient factors to have raised a serious doubt. McMillan had been an internal auditor for General Motors and we conclude that he did not actually rely on the fact of an affiliation of the companies in making his decision to purchase the distributorship. It does appear that all the plaintiffs relied on the fact that Kodak film would be sold, and with their knowledge of Kodak products probably expected that this would contribute to sales. However, there was no misrepresentation there, as defendant did supply Kodak film.

As to the representations about locations and profitability of the plaintiffs' future distributorships and Firestone's existing distributorships, defendant argued that it was not reasonable for the plaintiffs, most of whom were well-educated, to rely. The court concludes that it was not so unreasonable that one must infer that there was no actual reliance. Forsythe had experience in insurance sales, Lee was a commercial photographer and was familiar with photographic products and processes, McMillan

was an internal auditor, and Dabney had some law school. However, none of this experience was particularly useful or applicable to the business aspects of the type of film distributorship involved here, especially with the unique characteristics of the prepaid processing market. The misrepresentations were of a type not easy to verify by these plaintiffs. Each made inquiries of various sorts, none of which was successful in eliciting the true facts. Several asked about other distributors, but all were put off with explanations about why they couldn't be given a name to contact at that time. The high pressure sales tactics, while not fraudulent in themselves, are a factor to be considered in whether it was unreasonable not to pursue the inquiries further. Where the actions of Firestone personnel themselves inhibited investigation, defendant is not in a position to challenge the plaintiffs' actions.

## DAMAGE

Each of the plaintiffs sustained loss as the proximate result of the representations having been made. No challenge was made to the plaintiffs' state court judgments as being the amount of each debt which would be nondischargeable.

Although bankruptcy is intended to give a debtor a fresh start, the policy of liberality of interpretation in favor of the debtor is not meant to protect the dishonest debtor. *Bruning v. United States,* 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964).

Plaintiffs have carried their burden of proving that Daniel Firestone's debts to them should not be discharged. Pursuant to B.R. 921(a) a Final Judgment incorporating these Findings and Conclusions is being entered this date.