In re Ralph R. FARBMAN, Debtor.

Bell Auto Leasing, Inc., a/k/a Anything With Wheels, Plaintiff,

v.

Ralph R. Farbman, Defendant.

Bankruptcy No. 98 B 29880.
Adversary No. 98 A 02122.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Feb. 2, 2000.

Karen Coffey, Berger, Newmark & Fenchel, P.C., Chicago, IL, for Plaintiff.

Jonathan Shimberg, Shimberg & Crohn, Evanston, IL, for Defendant.

### MEMORANDUM OPINION

JACK B. SCHMETTERER,
Bankruptcy Judge.

This adversary proceeding relates to the bankruptcy petition filed by Debtor Ralph R. Farbman ("Debtor") under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. After several aborted pleading efforts, Plaintiff Bell Auto Leasing, Inc. ("Bell") has filed its third amended complaint ("Complaint") requesting that a debt assertedly owed by Debtor to Bell be found nondischargeable under the Bankruptcy Code, 11 U.S.C. § 523(a)(6). Debtor has moved to dismiss based on two grounds: (1) that Bell's allegations are not against Debtor in his personal capacity but rather against Northwest Highway Auto Group, Ltd. ("Northwest"), a corporation in which Debtor was president and (2) that there has been no pleading of an injury to Bell or to property in which Bell has an interest as required under § 523(a)(6).

Debtor discussed Bell's citations, but has chosen to cite no other authority in support of its motion, except that he questions whether Bell can properly do business under an assumed name, not an issue relevant to the instant motion.

As discussed below, Bell has stated a claim for relief and its Third Amended Complaint will not be dismissed.

### JURISDICTION

Jurisdiction lies under 28 U.S.C. § 1334 and 28 U.S.C. § 157. This matter has been referred here by Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue is proper under 28 U.S.C.

§ 1409. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### ALLEGATIONS OF THE COMPLAINT

Debtor was the President of Northwest, which was incorporated on or about May 1, 1996 but was dissolved on or about October 1, 1997 (after the events took place that are complained of) for failure to file an annual report and pay its franchise tax. While incorporated, Northwest was licensed by the State of Illinois to sell and lease motor vehicles and was engaged in the business of selling and leasing motor vehicles at retail.

At all times mentioned here, Bell was an Illinois Corporation duly organized and existing under laws of the State of Illinois, and was engaged in the business of leasing motor vehicles. Its principal office and place of business is located in Northbrook, Illinois. A Mr. Robert Doppelt ("Doppelt") is its President.

In July 1997, Doppelt authorized Debtor to sell Bell's 1996 Dodge Avenger, VIN 483AU52N4TE56325 for which Bell owned and possessed the Illinois Certificate of Title ("Title"). Debtor and Bell agreed that Debtor would take possession of the car in order to sell it, while Bell retained possession of the Title. Debtor and Bell further agreed that when Debtor sold the car, Debtor would pay Bell $15,000 from the sale proceeds, and Bell would then surrender the auto Title to Debtor who would then be able to transfer title pursuant to the sale.

On August 18, 1997, Debtor sold the car to Michael J. Schultz ("Schultz") at which time Northwest and Schultz entered into a Bill of Sale and a Retail Installment Contract ("Contract"). Debtor signed the Bill of Sale and the Contract on behalf of Northwest as its President. At the time of that sale, Debtor gave Schultz possession of the car but not Title to it since Bell still held the Title.

On the same day that Debtor sold the car to Schultz, Long Beach Acceptance Corporation ("LBAC") purchased and took an assignment of the Contract. Debtor, acting on behalf of Northwest, executed the assignment to LBAC. Debtor then signed a draft drawn on LBAC's bank account to obtain payment from LBAC for the Contract, identified as Draft No. 0058345 in the amount of $18,116.47 dated August 18, 1997. Debtor signed that draft as drawer and named his company Northwest as the payee. The reverse side of the draft stated:

> "For value received, the payee, by the endorsement hereof, warrants that ... the payee will, immediately upon receipt of this instrument, supply Long Beach Acceptance Corp. with the original Certificate of Title to said motor vehicle with a first and prior lien in the name, of Long Beach Acceptance Corp. noted thereon, and that at the time of sale of said motor vehicle, the payee [Northwest] had the right to transfer absolute and unencumbered Title thereto."

Debtor deposited the draft in an account at North Shore Community Bank & Trust on or before August 29, 1997, but he did so without endorsing it. Bell alleges that Debtor intentionally did not endorse the draft because he knew endorsing the draft would constitute a breach of the warranty language on the back of the LBAC draft. Bell also alleges that Debtor knew that under the agreement between Bell and Debtor, Debtor could not obtain the Title from Bell unless Debtor paid Bell $15,000 from the proceeds of the sale which Debtor allegedly "had no intention of paying" Bell. LBAC honored the draft and Northwest apparently received payment of the $18,116.67.

On September 2, 1997, Doppelt and Debtor had lunch and Doppelt asked Debtor if he had the $15,000 for Bell from the sale of the car. Debtor allegedly falsely represented to Doppelt over that lunch meeting that he had not received any money from sale of the car despite the fact that he had three days earlier signed and deposited the draft drawn on LBAC's bank

in payment of the Contract from the sale of the car.

After Schultz purchased the car, he went to the Secretary of State's office to apply for license plates and was informed that he could not get license plates for the car without the Title. Schultz then contacted the Debtor and asked for the Title. Debtor informed Schultz that he did not have the Title and that he had sold the Contract to LBAC.

Schultz then contacted LBAC and requested the auto Title. On or about October 20, 1997, Schultz returned the car to LBAC. LBAC accepted the car and also agreed "not to enforce [its] contractual agreement due to apparent fraud on behalf of Northwest Auto Sales."

Sometime after October 20, 1997, based on an agreement between LBAC and Bell in settlement of litigation between them, LBAC sold the car and equally divided the net proceeds from the sale between LBAC and Bell. The net proceeds from that sale of the car was $8,500 and LBAC and Bell each received $4,250.

No funds were ever received by Bell from Debtor despite Debtor's receipt of the draft from LBAC and the payment thereof. Debtor never provided Bell with any explanation regarding why Debtor did not pay Bell the $15,000.

Although Doppelt authorized Debtor to sell the car, that authorization was given because Debtor was to pay Bell $15,000 from proceeds of any sale. After Debtor sold the car to Schultz, Bell alleges that it retained a "property interest" of $15,000 in the proceeds of the car sale. According to Bell it was caused harm by the "sale of the car" by Debtor to Schultz because pursuant to Illinois law under 810 ILCS 5/2–403(2), Bell entrusted the car to Debtor and Debtor was authorized to transfer to Schultz all rights that Bell had to the car, even though Bell still held the car's Title.

Bell alleges that Debtor as a principal and a controlling person of a motor vehicle dealership (Northwest), knew that Bell would be immediately harmed by the sale to Schultz if Debtor did not pay Bell its $15,000 "property interest" which "Debtor had no intention of paying."

Bell requests a finding of willful and malicious injury by Debtor to Bell's "property interest" in the car sale proceeds, and seeks judgement that Debtor's indebtedness to Bell constitutes a nondischargeable debt pursuant to 11 U.S.C. § 523(a)(6). Bell also seeks a money judgment against Debtor for the $15,000 plus prejudgment and post judgment interest and costs and expenses as provided by law.

### STANDARDS FOR MOTION TO DISMISS

Federal Rule of Civil Procedure 12(b)(6) is incorporated by reference in Federal Rule of Bankruptcy Procedure 7012. When presented with a motion to dismiss for failure to state a claim, the court accepts all well pleaded factual allegations of the complaint as true and draws all reasonable inferences therefrom in favor of the plaintiff. *Evans v. Lederle Laboratories,* 167 F.3d 1106, 1108 (7th Cir.1999). If a complaint contains allegations from which the trier may reasonably infer that evidence on the necessary elements of proof will be adduced at trial, the complaint may not be dismissed. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 421 (7th Cir.1994). "Further, the court has a duty to consider whether a plaintiff's allegations could provide relief under any available legal theory." *Id.* The complaint need not support a viable claim only under the particular legal theory pleaded by the plaintiff. *Id.* To survive a motion to dismiss, a plaintiff need not identify the correct legal theory if some theory is viable. *Cass v. American Properties, Inc.,* 861 F.Supp. 55, 57 (N.D.Ill.1994). Thus, a court will grant a motion to dismiss only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief". *Sidney S. Arst Co.,* 25 F.3d at 421.

## DISCUSSION

The essence of Bell's Complaint can be summarized in a few sentences: Bell entered into an oral contract with Debtor for him to sell Bell's car on behalf of Bell. After selling the car, Debtor was to collect the sale proceeds for Bell, remit $15,000 of those proceeds to Bell and retain any surplus for himself. Debtor sold the car and the dealership he controls collected the proceeds, but the proceeds were not remitted to Bell, contrary to the agreement.

### *An agency relationship was pleaded*

■ It can be concluded that, although Bell never uses the terms "principal" and "agent" in describing its relationship with Debtor, it has essentially alleged the creation of an agency relationship between Bell and Debtor. Under Illinois law, to determine whether an agency relationship exist, the court must consider two factors: (1) whether the alleged principal has the right to control the manner and method in which the agent performs his services and (2) whether the alleged agent has the power to affect legal relations of the principal. *Chemtool Inc. v. Lubrication Techs. Inc.,* 148 F.3d 742, 745 (7th Cir.1998). An agency relationship does not require an express appointment and acceptance. *American Envtl., Inc. v. 3–J Co.,* 222 Ill.App.3d 242, 248, 164 Ill.Dec. 733, 738, 583 N.E.2d 649, 654 (2d Dist. 1991). Based on allegations in its Complaint that Bell authorized Debtor to sell the car and Debtor was responsible for collecting the proceeds and remitting them to Bell, Bell has sufficiently alleged an agency relationship. *See Cumis Ins. Soc'y, Inc. v. Peters,* 983 F.Supp. 787 (N.D.Ill.1997)(Allegations that parties had agreement pursuant to which one party bestowed the responsibility for collecting money and asserting claims on its behalf on other party and required that the other party account for the money collected, sufficiently alleged an agency relationship to prevent dismissal of complaint).

### *The Complaint does plead an injury to Bell and its property under § 523(a)(6).*

■ Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." (Emphasis supplied.)

■ Debtor bases his motion to dismiss, in part, on argument that Bell never suffered any injury to its property because it never had an interest in proceeds from the car sale, but rather its property interest lay only in the car itself. As shown below, Bell's property interest was converted. Moreover, because § 523(a)(6) is written in the disjunctive, Bell need not suffer an injury to its property to state a claim under § 523(a)(6) but can suffer an injury to itself.

The oral agreement between Bell and Debtor provided that Bell would be paid $15,000 from the proceeds. Instead of receiving $15,000 from Debtor, pursuant to the contract, Bell received only $4,250 from LBAC when LBAC and Bell agreed to sell the car and split the proceeds after Debtor's conduct came to light. It is inarguable that Bell's receipt of only $4,250 from the LBAC re-sale when it should have received $15,000 from Debtor after the original sale constituted an "injury to another entity" (namely Bell) under the statute.

In order to determine the parties' rights in proceeds for purposes of the "injury to property of another entity" provision of § 523(a)(6), Illinois law on agency must be looked to. *Butner v. U.S.,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979)(Congress has left determination of property rights in assets of the bankrupt to the states.)

■ When Debtor as agent sold Bell's car, the sale proceeds were collected by Debtor for the benefit of its principal Bell. An agent does not own property transferred to it or to an agency owned by it for

the benefit of the principal. *Just Pants v. Bank of Ravenswood,* 136 Ill.App.3d 543, 547, 91 Ill.Dec. 49, 53, 483 N.E.2d 331, 335 (1st Dist.1985). An agent who collects money on behalf of the principal does not become the owner of such money. *Kearney v. Webb,* 278 Ill. 17, 20–21, 115 N.E. 844, 845–6 (1917). Thus, neither Debtor nor the company he controlled became owner of sale proceeds, but rather those proceeds were the property of Bell to the extent of the promised $15,000. *See In re Greenfield,* 171 B.R. 848, 858 (Bankr.N.D.Ill.1994)(Property held by a debtor as agent does not become property of the estate, as it belongs to someone else usually the principal.) Moreover, when Debtor sold the car without turning the proceeds over to Bell, and misrepresented that he had not received the proceeds when Bell requested them, Debtor's authority to sell pursuant to the agreement was arguably used to effect a wrongful conversion of Bell's property then consisting of the $15,000 due Bell. *Metalexport Co. v. Gen–O–Ral Processing Corp.,* 365 F.2d 178 (7th Cir.1966)(under consignment agreement whereby consignee was permitted to place goods in premises of another who was agent of consignee, when agent sold goods without turning the proceeds over to consignor, agent's rightful possession became a wrongful conversion.)

■ A conversion is any unauthorized act, which deprives an owner of property permanently or for an indefinite time. *In re Thebus,* 108 Ill.2d 255, 259, 91 Ill.Dec. 623, 625, 483 N.E.2d 1258, 1260 (1985). "The subject of conversion is required to be an identifiable object of project of which the plaintiff was wrongfully deprived." *Id.,* 108 Ill.2d at 260, 91 Ill.Dec. at 625, 483 N.E.2d at 1260. Money may be the subject, but it must be capable of being described as a specific chattel. *Id.* Here, Bell has alleged the conversion of the first $15,000 which Debtor received from sale of Bell's car, and which belonged to Bell.

### A corporate officer can be held personally liable for corporate tortious conduct participated in.

■ Debtor's second argument in support of his motion to dismiss is that Bell's allegations lie if at all against his company Northwest and not against him personally. However, the law is well settled that corporate officers and directors may be held personally liable for conversions by the corporation if they have actively participated therein. *Eggert v. Weisz,* 839 F.2d 1261, 1264 (7th Cir.1988). *See Lobato v. Pay Less Drug Stores, Inc.,* 261 F.2d 406, 408–09 (10th Cir.1958)(If a corporate officer directs or participates actively in the commission of a tortious act he may be held personally liable to a third person for injuries resulting therefrom.); *McMillan v. Firestone,* 26 B.R. 706, 714 (Bankr.S.D.Fla.1982)("[A]n officer, director or shareholder of a corporation will not be shielded by the corporate form from liability for tort, including fraud, in which he himself is involved.")

Bell's current complaint alleges that Debtor signed a draft drawn on LBAC's bank account to obtain payment from LBAC for the Contract. Debtor deposited the draft in a Northwest bank account but later misrepresented to Bell that he had not received proceeds from sale of the car. Thus, even if Bell's allegations show the money was transferred to Northwest, Bell has sufficiently alleged Debtor's active participation in the conversion to state a possible cause of action for personal liability on Debtor's part.

### Bell has stated a cause of action under 11 U.S.C. § 523(a)(6) for willful and malicious injury.

■ Having determined that Bell has alleged a property interest in the sale proceeds, and that Debtor can be held personally liable for conversion even though acting as one in control of a company, it must now be determined whether Bell has sufficiently alleged that the conduct of Debtor

causing the injury was willful and malicious as required under § 523(a)(6).

The Supreme Court recently addressed the proper interpretation of the term "willful" under the discharge exception in § 523(a)(6) in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). That opinion held that § 523(a)(6) does not encompass acts done intentionally that happen to cause injury, but rather refers to acts done with the actual intent to cause injury. *Id.*, 523 U.S. 57, 118 S.Ct. at 977. As such, nondischargeability requires deliberate or intentional injuries, not recklessly or negligently inflicted injuries. *Id.*

 The Supreme Court did not in *Kawaauhau* define the scope of the term "intent" used in the opinion to describe willful conduct. However, recent opinions have found that either a showing of subjective intent to injure the creditor or a showing of a debtor's subjective knowledge that injury is substantially certain to result from his acts can establish the requisite intent required in *Kawaauhau. See In re Markowitz*, 190 F.3d 455 (6th Cir.1999); *In re Budig*, 240 B.R. 397 (D.Kan.1999); *In re Kidd*, 219 B.R. 278 (Bankr.D.Mont. 1998).

In its Complaint, Bell pleads that Debtor never intended to pay it from the sale of the car. Debtor, as would anyone, had to have been substantially certain that an intentional failure to ever pay the $15,000 that the parties agreed to would cause injury to Bell.

Moreover, the term "malicious" under § 523(a)(6) means in conscious disregard for one's duty or without just cause or excuse. *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994). Ill will or specific intent to do harm is not required. *In re Arlington*, 192 B.R. 494 (Bankr. N.D.Ill.1996). As an alleged agent, Debtor's selling of its principal's property without remitting the proceeds collected on its behalf, and misrepresenting to its principal that it had not received the proceeds could be found to be in conscious disregard of Debtor's duties.

## CONCLUSION

For reasons stated, the Complaint of Bell has stated a claim under § 523(a)(6) and its Complaint will not be dismissed.