**In the Matter of Francis S. FALLON, Jr., Debtor.**

**Doctor Richard RODGERS, Plaintiff,**

**v.**

**Francis S. FALLON, Jr., Defendant.**

**Bankruptcy No. 81–989.**

**Adv. No. 81–403.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

March 17, 1983.

John W. Campbell, Tampa, Fla., for plaintiff.

Russell K. Peavyhouse, Tampa, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a contested discharge proceeding and the matter in controversy is the

dischargeability, vel non, of a debt allegedly owing to Dr. Richard Rodgers, the Plaintiff who instituted the above-captioned adversary proceeding. The claim of non-dischargeability is asserted against Francis Stewart Fallon, Jr., the Debtor, who seeks relief under Chapter 7 of the Bankruptcy Code. Inasmuch as this is a civil proceeding arising in a case filed under Title 11 of the Bankruptcy Code, by virtue of the Emergency Local Rule (d)(2) it can be resolved by the entry of a final dispositive order by this Court which will become effective upon the entry by the Clerk of the Bankruptcy Court, unless stayed on an appropriate motion either by the undersigned Bankruptcy Judge or by a District Judge.

It is the contention of the Plaintiff that the Debtor obtained money from the Plaintiff under false pretenses or by actual fraud. Thus, according to the Plaintiff, the debt owed by the Debtor to the Plaintiff should be excepted from the protective provisions of the general bankruptcy discharge by virtue of § 523(a)(2)(A) of the Bankruptcy Code.

The facts relevant and germane to the resolution of this factually complicated controversy, as established at the final evidentiary hearing, can be summarized as follows:

The Plaintiff, Dr. Rodgers, is a practicing physician and investor in various properties, primarily properties that qualify as tax shelters. The Defendant, Mr. Fallon, was a principal in numerous corporate entities including the three most relevant to this controversy, Blackhawk International Corp., Blackhawk Productions, Inc., and Global Films, Inc. The Defendant was the president and controlling stockholder of Blackhawk International and of Blackhawk Productions. He was also one of four organizers of Global Films, a corporation formed to purchase the film, "The Intruder," and with the intent of making additional purchases in the future for resale to investors seeking tax shelters.

Intruder Ltd. (Intruder) is a limited partnership in which Chris Robinson, a well-known movie actor was a general partner. Intruder was the owner and producer of a full-length motion picture entitled "The Intruder," starring Mickey Rooney, Yvonne DeCarlo, Ted Cassidy and Chris Robinson.

On May 7, 1976, Global purported to grant a 90 day option to purchase "The Intruder" to D.C.T.I. (Pl's Exh. # 5). D.C.T.I. is a Florida limited partnership composed of physicians and formed primarily to acquire properties to be used as tax shelters. Global, however, did not actually acquire an option from Intruder until May 5, 1976, three days after the Global-D.C.T.I. option agreement (Pl's Exh. # 13). Furthermore, the option obtained by Global from Intruder was a 60 day option; Global, however, purported to assign a 90 day option to D.C.T.I.

The Defendant learned of Plaintiff's interest in purchasing "The Intruder," and arranged a showing of the film. On July 14, 1976, after Global's 60 day option had expired, and after Global had already assigned its option to D.C.T.I., Blackhawk International Corp. entered into an acquisition agreement whereby it purported to convey all right, title and interest in "The Intruder" to the Plaintiff (Pl's Exh. # 1). In addition, Blackhawk unequivocally warranted that Blackhawk:

"is the exclusive and sole owner of all right, title and interest in the film and the territory, including, without limitation, all rights in and to the physical properties, the literary, dramatic and musical material contained in the film, and the right of distribution, marketing and exhibition of the film; and seller is able, without restrictions, to enter into the within agreement for the purchase of all of seller's rights, as herein set forth."

It is without dispute that at the time this acquisition agreement was signed, Blackhawk had no cognizable legal or equitable ownership interest in "The Intruder." The assignment by Intruder to Global was no longer in force at the time Global purported to assign its interest in the option to Blackhawk. The fact of the matter is, and it is without dispute, that at the time the acquisition agreement was signed there was still

an outstanding valid option in favor of D.C. T.I. Be that as it may, even if one assumes that Blackhawk still had some form of option to purchase "The Intruder," there is no question that Blackhawk did not own the film "The Intruder."

It further appears that Global's right to obtain "The Intruder" (Exh. # 13), was not co-extensive with the terms under which "The Intruder" was sold to the Plaintiff by Blackhawk (Exh. # 1). The acquisition agreement (Pl's Exh. # 1) gave the Plaintiff the following principal rights:

(a) Dr. Rodgers was to have the sole right to distribute or select the distributor for "The Intruder," (Section 3F);

(b) Dr. Rodgers was to receive the first $261,000 net proceeds from the movie before any retirement to pay any monies to Intruder Ltd. and when such monies were to be paid, Dr. Rodgers would be entitled to receive 55% of the net proceeds whereas Intruder, Ltd. would only receive 45% of the net proceeds (Section 5C).

It is without dispute that, in spite of the foregoing requirements of the contract, the film could not be conveyed to the Plaintiff simply because contrary requirements contained in the option granted by Intruder to Global (Exh. # 13), provided that Pyramid Pictures (Pyramid) should be the guaranteed distributor of "The Intruder," as opposed to the provision in the acquisition agreement which granted the Plaintiff the sole right to select the distributor (See paragraph 5 at page 5 of Exhibit # 13). In addition, the option further provided that immediately upon the payment of the theater rentals, Intruder Ltd. and the Plaintiff would split the income on a 50/50 basis, which is again contrary to the provisions in the acquisition agreement which provided that the Plaintiff should receive the first $261,000 net income after the theater rentals generated by "The Intruder" with a 55/45 split thereafter (See paragraph 5 at page 5, Exhibit # 13).

It is without dispute that Plaintiff paid as downpayment for the film the sum of $170,000 to Blackhawk. While it is unclear from the record whether or not the monies paid by the Plaintiff were paid directly to Blackhawk International or Productions or to some other entity controlled by the Debtor, there is no question that the Debtor was the controlling principal in all these entities, including Global, the original holder of the option to purchase "The Intruder."

In spite of the Plaintiff's inability to obtain a satisfactory resolution of this problem, the Plaintiff maintained further contact with the Debtor and negotiated the purchase of another motion picture entitled "Combat Killers," which was supposed to be the replacement for "The Intruder," provided the Plaintiff would pay an additional $15,000. It appears that "Combat Killers" was not a new picture. It had been on the market for three or four years before, without success of any sale or sale of distribution rights in the United States and could have been obtained in the open market for about $25,000 plus brokerage and other fees.

The Plaintiff, having failed to obtain a satisfaction from the Defendant, filed an action in the Circuit Court of the 13th Judicial Circuit of the State of Florida in and for Hillsborough County, naming as Defendants Blackhawk International Corp., Blackhawk Productions, Inc., R.C. Johnson, Benjamin E. Crosby and the Debtor, F.S. Fallon, Jr. This action was tried on the following issues:

1. Whether Blackhawk is able, at this time, to convey "The Intruder" to the Plaintiff, Dr. Rodgers and, if so, is the Plaintiff entitled to specific performance?

2. If Blackhawk is unable to perform, is the Plaintiff entitled to refund of the $170,000 paid?

3. What is the personal liability of the Defendant, if any, to the Plaintiff?

Thus, it appears that while the State Court action resolved the question of liability of the Debtor, it did not resolve the issue of fraud in the sense which would warrant the finding that the question of discharge-

ability is laid to rest by the State Court judgment and operates as res judicata, thus foreclosing any further inquiries as to the character of the liability represented by the State Court judgment.

The claim of non-dischargeability is based on § 523(a)(2)(A) which provides as follows:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

    (2) for obtaining money, property, services or an extension, renewal, or refinance of credit, by—

        (a) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

Under this Section, it is a burden on the Plaintiff to establish the requisite degree of proof that the Defendant did obtain the money or property by false pretenses or by actual fraud.

The record in this case is replete with evidence and there is hardly any doubt that the Debtor knowingly misled the Plaintiff by representing to him that Blackhawk had the right to sell "The Intruder." There is ample evidence in this record that the Debtor deceived the Plaintiff concerning Blackhawk's ownership interest in "The Intruder" and that he deceived the Plaintiff by intimating that D.C.T.I. waived or released its option, thereby removing the roadblock to the sale of "The Intruder" to the Plaintiff.

The only question remaining is whether or not the Debtor obtained money from the Plaintiff, or whether the money was obtained by one of his fellow co-defendants or by one of the corporate entities involved in this confusing and complex deal.

Contrary to the contention by counsel for the Debtor, it is not the Plaintiff's burden to establish that the Defendant has personally received the property obtained through fraud. While this proposition has some support, the better view seems to be that it is not necessary that the property be actually procured by the Debtor himself. 3 *Collier on Bankruptcy,* ¶ 523.08(1) (15th ed. 1982).

There is no question, in this instance, as noted earlier that the Debtor had direct and immediate control of all aspects of the business of Blackhawk International and Blackhawk Productions. While it is true that Crosby and Johnson also received monies out of the funds obtained from the Plaintiff, the Debtor, through his corporation, did receive $25,000 immediately after the receipt of the $170,000 from the Plaintiff. This entity, controlled by the Debtor, performed no identifiable services. The Debtor also paid with corporate funds $9,780 to purchase a 1974 Jaguar, which automobile was placed in his own name. The Debtor took several trips to Europe, all of which were paid by corporate funds and there is no showing in this record that they were, in any way, legitimate business trips. It appears to the contrary that the trips were for personal reasons. The Debtor also purchased a 35 foot yacht with corporate funds and paid all the maintenance and upkeep for the yacht with corporate funds. This yacht was ultimately sold. There is no evidence that the proceeds of this sale were ever actually obtained by Blackhawk. There are numerous other instances which appear from the deposition and Exhibits that during the time relevant, the Debtor received checks in varying amounts for payment of his personal expenses.

In sum, it is clear that the Debtor, using his dominant position in these entities, had the benefit of the majority of the funds obtained from the Plaintiff, inasmuch as it is clear that neither Blackhawk Productions nor Blackhawk International had any income whatsoever from any source other than the monies paid by the Plaintiff for the purchase of "The Intruder." Accordingly, it is evident that these corporate entities were merely conduits through which the funds were channeled to the ultimate recipient, the Defendant.

The record is clear that the Debtor was the Chairman of the Board, the President and controlling stockholder of Blackhawk International and Blackhawk Productions. He was also one of the organizers and one of the moving forces in Global. While there is evidence in this record to show that,

in addition to the Debtor, his co-defendants, Johnson and Crosby, as well as some other parties were actively involved in this entire plot to deceive the Plaintiff, there is no doubt that the corporate entities did obtain monies from the Plaintiff directly and from the Debtor indirectly. In addition, this issue has been resolved with finality by the entry of a final judgment against the Debtor by the State Court in the principal sum of $170,000, therefore, it is no longer subject to any further inquiry.

Pursuant to Fla.Stat. § 687.02 (1981), interest on judgments accrues at the rate of 8% per annum and would accrue on the entire balance until a judgment is satisfied. In this instance, it appears that the Plaintiff was able to levy and execute on the judgment on the home of the Defendant. The house was ultimately sold at a sheriff's sale on December 31, 1981. At that time, the Debtor became entitled to a credit in the amount of $170,000, giving credit against the judgment and adding the earned and accrued interest as of the date of September 25, 1982, the date of the final evidentiary hearing. Thus, the Debtor is still indebted to the Plaintiff in the amount of $68,255.71.

The Plaintiff in Count 3 of his complaint seeks a determination of non-dischargeability based on § 523(a)(4) which provides that debts based on fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny, are non-dischargeable debts. While this Court is satisfied that the Plaintiff did establish the requisite degree of proof of the claim of non-dischargeability based on § 523(a)(2) of the Bankruptcy Code, this record would not warrant the finding that the Defendant is guilty of larceny. Thus, the claim of non-dischargeability under § 523(a)(4) cannot be sustained.

A separate final judgment will be entered in accordance with the foregoing.