In re Lester FIELDS, Debtor.

TAKEUCHI MFG. (U.S.),
LTD., Plaintiff,

v.

Lester FIELDS, Defendant.

Bankruptcy No. 82–01820–BKC–JAG.
Adv. No. 82–1140–BKC–JAG–A.

United States Bankruptcy Court,
S.D. Florida.

Sept. 24, 1984.

**324**

Donald A. Bacek, Atlanta, Ga., Alan R. Stone, Coral Gables, Fla., for plaintiff.

Reggie David Sanger, Fort Lauderdale, Fla., for defendant.

## MEMORANDUM OF DECISION

JOSEPH A. GASSEN, Bankruptcy Judge.

Plaintiff, Takeuchi Mfg. (U.S.), Ltd. ("Takeuchi") commenced this adversary proceeding by filing a complaint against the defendant, Lester Fields ("Fields"), seeking to have Fields' debt to Takeuchi declared nondischargeable. Following discovery and three amendments to the complaint, trial of this adversary proceeding was held on July 24, 1984, on Takeuchi's Third Amended Complaint. Pursuant to the Third Amended Complaint Takeuchi sought to except Fields' debt from discharge on the basis that his debt was for

obtaining an extension, renewal, or refinance of credit by a false representation or fraud, in accordance with § 523(a)(2)(A) of the Bankruptcy Code; fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, in accordance with § 523(a)(4) of the Bankruptcy Code; or willful and malicious injury to property, in accordance with § 523(a)(6) of the Bankruptcy Code.

### Findings of Fact

1. Takeuchi is in the business of selling excavation equipment and has its offices in Atlanta, Georgia. During the years 1980 through 1982, Takeuchi made sales of excavation equipment to a customer located in Hallandale, Florida, named Ray's Equipment Co. of South Florida, Inc. d/b/a Bobcat of South Florida ("Bobcat"), which filed a petition under Chapter 7 of the Bankruptcy Code on September 28, 1982.

2. At all times relevant to this action Fields, who likewise filed a petition under Chapter 7 of the Bankruptcy Code on September 28, 1982, was the owner and President of Bobcat. In such capacity Fields supervised the operation of Bobcat on a daily basis.

3. Beginning in March 1980 and ending in June 1982, Takeuchi sold and delivered to Bobcat on credit six backhoes. At the time of the commencement of Bobcat's Chapter 7 case, the principal balances owed by Bobcat on each of the backhoes purchased from Takeuchi were as follows:

| | |
|---|---|
| TB1200, Serial No. 10092 and | |
| TB1200, Serial No. 10093 | $15,344.88 |
| TB2200, Serial No. 22016 | $28,083.90 |
| TB2200, Serial No. 22009 | $28,782.00 |
| TB0800, Serial No. 8028 | $15,410.00 |
| TB1200, Serial No. 10125 | $12,100.02 |

The total principal amount owing by Bobcat to Takeuchi as of the commencement of Bobcat's Chapter 7 case was, therefore, $99,720.80. At the time of trial this entire amount remained unpaid.

4. The Court takes judicial notice of the Proof of Claim filed by Takeuchi in Bobcat's Chapter 7 case on April 14, 1983,

to collect the aforesaid indebtedness directly from Bobcat, but the evidence shows that as of the time of trial no distributions had been made to Takeuchi on account of its Proof of Claim.

5. To induce Takeuchi to make certain of the foregoing sales to Bobcat on credit, Bobcat entered into with Takeuchi a Purchase Money Security Agreement, dated March 17, 1981 (the "Security Agreement"), covering the above TB1200, Serial No. 10092, and TB1200, Serial No. 10093, and a Distributor's Floor Plan Agreement, dated March 17, 1981 (the "Floor Plan Agreement"), covering sales of excavation equipment by Takeuchi to Bobcat, including TB800's, TB1200's and TB2200's. Both agreements were signed on behalf of Bobcat by Fields as its President.

6. Pursuant to the Security Agreement, Bobcat agreed to grant Takeuchi a security interest in the above TB1200, Serial No. 10092, and TB1200, Serial No. 10093, to secure all liabilities of Bobcat to Takeuchi, including the indebtedness described in paragraph 3 above. The Security Agreement also provided in relevant part as follows:

15. *Default.* The Debtor [Bobcat] shall be in default under this Security Agreement on the happening of any of the following events or conditions:

(a) Default in the timely payment of monies owed hereunder or performance of any obligation, covenant, or liability contained or referred to herein;

(b) Any warranty, representation, or statement made or furnished to the Secured Party by or in behalf of the Debtor proves to have been false in any material respect when made or furnished;

(c) Any default by Debtor under any other security agreements between Debtor and Secured Party;

(d) Loss, theft, substantial damage, destruction, sale, or encumbrance to or of any of the Collateral, or the making of any levy, seizure, or attachment thereof or thereon;

.        .        .        .        .

16. *Remedies.* On the occurrence of any such event of default, and at any time thereafter, the Secured Party may declare all obligations secured hereby immediately due and payable and may proceed to enforce payment of the same and exercise any and all rights and remedies provided by the Uniform Commercial Code as well as other rights and remedies, either at law or in equity, possessed by the Secured Party, including but not limited to, the right to sue Debtor for payment of the purchase price, plus accrued interest, plus all costs of collection, including 15% attorneys' fees, if collected through an attorney at law.

The Security Agreement further provided as follows: "Debtor will give Secured Party immediate notice of any authorized sale of any of the Collateral."

7. The Floor Plan Agreement provided for Bobcat to pledge to Takeuchi the equipment financed pursuant to its terms and provided that Takeuchi "will have the unqualified right to possess and dispose of the financed Equipment, including additions to, substitutions for and proceeds from the sale of the Equipment." In addition, the Floor Plan Agreement provided for 18-month payment terms, with no interest for the first nine months, and further that "[t]he total purchase price and any interest will be due earlier if the Distributor [Bobcat] sells or leases the Equipment." The undisputed testimony also confirmed that the unpaid purchase price of each backhoe was due and payable at the time of resale by Bobcat or within a few days thereafter.

8. Of the backhoes which are the subject matter of this action, Takeuchi filed a financing statement with the Secretary of State of Florida only with respect to TB1200, Serial No. 10092, and TB1200, Serial No. 10093, as shown in the exhibits to Takeuchi's Proof of Claim filed in Bobcat's Chapter 7 case.

9. In March 1980, Bobcat began selling backhoes purchased from Takeuchi without informing Takeuchi of the sales, without turning the proceeds of the sales or any

part thereof over to Takeuchi, and without otherwise paying the unpaid balance of the purchase price of the machines. Each sale was either made or approved by Mr. David Carlson, the Sales Manager of Bobcat, and each sale was presented by Mr. Carlson in advance to Fields for final approval, who personally authorized and approved each sale. In March 1980 Bobcat sold TB1200, Serial No. 10093, to Sunland Crane Company; on May 4, 1981, Bobcat sold TB1200, Serial No. 10092, to Gail Scott d/b/a Scotty's Bobcat Service for $26,936.00; on September 4, 1981, Bobcat sold TB1200, Serial No. 10125, to Frye Tool Rental for $25,-900.00; in August 1981, Bobcat sold TB2200, Serial No. 22016, to Held Plumbing Company; on September 10, 1981, Bobcat sold TB2200, Serial No. 22009, to Odell Googe for $38,900.00; and on July 2, 1982, Bobcat sold TB800, Serial No. 8028 to Seaboard Mechanical Corp. for $22,057.00.

10. In the case of each of the above sales, Bobcat was paid the purchase price in cash, either directly from the customer or from the proceeds of a loan made to the customer. In none of the cases did Bobcat turn over the proceeds to Takeuchi or any part thereof.

11. In January 1982, Mr. H.C. Smith, Eastern Regional Sales Manager of Takeuchi, telephoned Bobcat and informed Bobcat that he intended to visit Bobcat's premises in Hallendale, Florida, to inspect its inventory of Takeuchi machines. Upon learning of Mr. Smith's impending visit, Fields instructed Mr. Carlson and Mr. Norman Schlaak, Jr., a sales representative of Bobcat, to request the return to Bobcat's premises of certain Takeuchi backhoes previously sold by Bobcat. Fields instructed those individuals to state to Bobcat's customers as the reason for the requested return that the backhoes were to be inspected for turning mechanism problems. As a result, TB2200, Serial No. 22009, sold by Bobcat to Odell Googe in September of 1981, and TB2200, Serial No. 22016, sold to Held Plumbing Company in August 1981, were returned to Bobcat's premises. On or about January 19, 1982, Mr. Smith visited Bobcat's premises, inspected the inventory located there, and spoke to Fields. At no time did Fields or any other individual at Bobcat inform Mr. Smith that any of the machines located at Bobcat's premises had previously been sold.

12. Again in April 1982, Mr. Smith telephoned Bobcat and informed it that he intended to make another visit to Bobcat's premises to inspect Bobcat's inventory of Takeuchi machines. Again, upon learning of Mr. Smith's plan to visit, Fields requested individuals on his staff to obtain the return of Takeuchi backhoes previously sold. As a result, TB2200, Serial No. 22016, previously sold to Held Plumbing Company, was again returned to Bobcat's premises. Again, at Field's instructions, Held Plumbing Company was told that the machine was to be inspected for turning mechanism problems. When Mr. Smith arrived to make his inspection, that backhoe was on the premises, and Mr. Smith again was not informed that the backhoe had been sold.

13. At no time did Fields or his staff suspect that Takeuchi backhoes had turning mechanism problems, at no time did Fields or his staff intend to inspect Takeuchi backhoes for turning mechanism problems, and at no time did either the backhoe sold to Held Plumbing Company or the backhoe sold to Odell Googe experience turning mechanism problems. Finally, at no time did Bobcat in fact inspect those machines for turning mechanism problems. The Court finds as a matter of fact that Fields obtained the return of those two backhoes with the intention of deceiving Takeuchi into believing that those machines had not been resold and for the purpose of causing Takeuchi not to demand immediate payment of all sums outstanding on all Takeuchi backhoes previously sold to Bobcat.

14. Although certain of the backhoes Mr. Smith inspected had a relatively large number of hours registered on their meters, the hours could have been registered during demonstration work or during rental periods. In any event, Mr. Smith be-

lieved as a result of his inspections that all backhoes which he found on Bobcat's premises remained as a part of Bobcat's unsold inventory.

15. Takeuchi in the ordinary course of its business relied on reports from its dealers and on periodic inspections by its sales representatives to verify the location and condition of equipment in which it held a security interest. In the case at bar, Takeuchi's attempts to verify its collateral were frustrated by Fields' failure to inform Takeuchi of Bobcat's resales and by Fields' activities in obtaining the temporary return of equipment previously sold during the period of Mr. Smith's inspections. The Court finds as a matter of fact that Takeuchi's reliance on Mr. Smith's inspection reports and on Fields' failure to inform Takeuchi of the resales was reasonable.

16. As a result of Takeuchi's belief that the backhoes sold prior to Mr. Smith's January 1982 visit had not been sold, Takeuchi did not demand payment of the unpaid purchase price for each of those units. Specifically, the Court finds that through his actions set forth above, Fields obtained an extension of credit in the amount of $84,310.80, the total of the unpaid purchase prices owing on Serial Nos. 10092, 10093, 10125, 22016 and 22009.

17. On or about August 31, 1982, Mr. David W. Allen, Manager for Dealer Services of Takeuchi, was informed that Clark Equipment Company had "taken over" Bobcat's property. On September 1, 1982, he visited Bobcat's premises and met with Fields, who told him that all of the backhoes which are the subject of this action had been sold, that Bobcat no longer had the proceeds of the sales, and that Bobcat could not pay Takeuchi the amount owing to it. It was during that meeting that Takeuchi first learned that its collateral had been sold.

18. The Court finds that Fields' authorizing and approving the sale of backhoes purchased from Takeuchi without informing Takeuchi or turning over the proceeds of each sale to Takeuchi amounted to willful and malicious injury by Fields to the property of Takeuchi. The Court finds that Takeuchi suffered damages in the amount of $51,936.00 as a result of Fields' unauthorized sales, as discussed in Part Three of the Conclusions of Law, *infra,* and those findings set forth therein with respect to the value of the backhoes are incorporated herein as findings of fact.

## CONCLUSIONS OF LAW

### *Part One*

Initially, the Court must determine whether Fields is personally liable to Takeuchi, i.e. whether Fields has a debt to Takeuchi which is subject to being either dischargeable or nondischargeable. Only after a personal debt on the part of Fields is established can the Court determine whether the debt is for conduct proscribed in § 523(a) as giving rise to a nondischargeable claim.

It is clear that Bobcat has a contractual debt to Takeuchi in the amount of $99,720.80, the unpaid balance of the purchase price of goods sold and delivered to Bobcat by Takeuchi. But it is equally clear that Fields is not indebted to Takeuchi in any amount merely because he was a shareholder and officer of Bobcat. However, it is tortious conduct which Takeuchi claims gives rise to Fields' personal indebtedness. "[A]n officer, director or shareholder of a corporation will not be shielded by the corporate form from liability for a tort, including fraud, in which he himself is involved." *McMillan v. Firestone,* 26 B.R. 706, 714 (Bkrtcy.S.D.Fla.1982).

> It is the general rule that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom. *Lobato v. Pay Less Drug Stores, Inc.,* 261 F.2d 406, 408–09 (10th Cir.1958).

As discussed in the Findings of Fact, *supra,* and Parts Two and Three of the Conclusions of Law, *infra,* Fields personally

**328**

authorized and directed fraudulent conduct which resulted in Takeuchi's extension of credit to Bobcat in the amount of $84,-310.80, and he personally authorized and directed the sale of collateral of Takeuchi causing injury to Takeuchi in the amount of $51,936.00. As a result, Fields is liable to Takeuchi for the torts of fraud and conversion, respectively, and Fields has a personal debt to Takeuchi as a tortfeasor for his own actions and not merely the actions of the corporation.

*Part Two*

■ 1. Section 523(a)(2) of the Bankruptcy Code provides in relevant part:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... (2) for obtaining ... an extension, renewal or refinance of credit, by—(a) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.... 11 U.S.C. § 523(a)(2)(A).

The foregoing provision "with the addition of actual fraud, is identical to Section 17(a)(2) of the prior [Bankruptcy] Act and, therefore, the decisions applying Section 17a are pertinent". *In re Saul Quintana,* 4 B.R. 508, 2 C.B.C. 293 (Bkrtcy.S.D.Fla. 1980). To meet the exception to discharge set forth in Section 523(a)(2)(A), Takeuchi must establish that (1) Fields made representations; (2) at the time of the representations he knew they were false; (3) he made them with the intention and purpose of deceiving Takeuchi; (4) Takeuchi relied on such representations; and (5) Takeuchi sustained loss and damage as the proximate result of the representations having been made. *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540 (W.D.Va.1967); *In Re Lambert,* 21 Bankr. 23 (Bkrtcy.E.D.Mich. 1980).

■ 2. The evidence shows that Fields made representations to Takeuchi of two kinds. First, he failed to notify Takeuchi at the time of the sale of each of the backhoes which are the subject matter of this action. The Court is of the opinion that Fields' failure to inform Takeuchi of each sale, as it occurred, constituted a false representation "as surely as an overt act." *In re Saul Quintana,* 4 B.R. 508, 2 C.B.C. 293, 295 (Bkrtcy.S.D.Fla.1980). Second, the Court has found that Fields' actions in causing certain of the backhoes previously sold by Bobcat to be returned to Bobcat's premises, together with his failure to tell Mr. Smith at the time of the inspections that those particular machines were not owned by Bobcat, constituted false representations of the overt variety. In the case of both kinds of representations, it is clear that Fields knew they were false at the time they were made. Indeed, Fields went out of his way to assure that the representations at the time of Mr. Smith's visits were false.

■ 3. No real issue has been made of Fields' intentions in making the false representations to Takeuchi. The circumstances surrounding Fields' relevant activities permit the sole inference that Fields intended to deceive and was successful in deceiving Takeuchi into believing that certain of the backhoes sold by Bobcat to its customers had not been sold. The only direct evidence of Fields' intentions, which conceivably could have explained his behavior in some alternative manner, would have been Fields' own testimony. But Fields declined to testify at the trial, and he consistently refused to answer questions directed towards his activities at his deposition by invoking the Fifth Amendment to the United States Constitution.

[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: The Amendment "does not preclude the inference where the privilege is claimed by a *party to a civil cause.*" *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (citation omitted) (emphasis supplied by the Court) (1976).

Therefore, this Court draws the logical inference that Fields intended by his activities to deceive Takeuchi into believing that

certain of the Takeuchi backhoes had not been sold.

■ 4. As the Court has found as a matter of fact that Takeuchi relied on the foregoing representations and that its reliance was reasonable, the Court must determine whether Takeuchi sustained loss and damage as the proximate result of the representations having been made. The Court has found as a fact that the purchase price of each unit sold by Takeuchi to Bobcat was due not later than at or about the time of resale by Bobcat. Had Bobcat requested additional time to pay the unpaid balance owing on a particular unit at the time of resale, and had Takeuchi granted Bobcat the additional time, there would have been no question that Bobcat had obtained an extension of credit.

> In commercial law and usage, an extension means an indulgence by a creditor giving his debtor further time to pay an existing debt. When we speak of obtaining an extension of a promissory note or other obligation, we mean, not an increasing of the amount of the debt, but an extension of the time of payment. *State v. Mestayer*, 144 La. 601, 80 So. 891, 892 (1919) (citation omitted).

Had Bobcat obtained Takeuchi's consent to the additional time by making false representations, it would be clear that the terms of the exception set forth in Section 523(a)(2)(A) had been met and that the debt should be declared nondischargeable. But in the case at bar, Takeuchi had no opportunity to grant or deny the extension, because it was obtained involuntarily, i.e., by Field's activities, which prevented Takeuchi from knowing that the debt was due. This Court finds that the statute cannot be interpreted in a manner which would protect only a creditor who grants an extension of credit voluntarily and not one who is deceived into forbearing from collection without being given an opportunity to grant or deny the extension of credit.

■ While the record does not reveal direct evidence of what actions Takeuchi would have or could have taken to collect its debt had it known that the debt was due

at the time of each resale, it is the wrongdoing of Fields and not Takeuchi which make this question a hypothetical one. The Court has found that Bobcat received payment of the purchase price of each backhoe it sold and that those proceeds, once in Bobcat's possession, were no longer available at the time Takeuchi learned of the sales, and the Court can take judicial notice of the remedies at law and in equity which were available to Takeuchi at the time of each sale. The Court therefore finds that Takeuchi suffered damage and loss through the extension of the time for payment for each backhoe sold prior to Mr. Smith's visits in January and April, 1982, in the total amount of the unpaid balance of the purchase prices of each such backhoe, $84,310.80. *See, Household Finance Consumer Discount Company v. Gennaro*, 12 B.R. 4 (Bkrtcy.W.D.Pa.1981).

■ 5. The final question is whether Fields may somehow avoid the discharge of his debt to Takeuchi by reason of the fact that Takeuchi extended credit not to Fields personally, but rather to Bobcat, a corporation. In addition to the principle discussed in Part One, *supra,* that an individual cannot be protected by the corporate form from liability for tortious acts or omissions committed by the individual personally, it is well settled that Section 17a(2) of the Bankruptcy Act did not except from discharge liabilities for obtaining an extension of credit for the debtor only. *In re Kunkle*, 40 F.2d 563 (E.D.Mich.1930); *In re Dunfee*, 219 N.Y. 188, 114 N.E. 52 (1916).

> If that had been the intention of the Congress, the Act could have been so worded .... [The exception from discharge for obtaining property by false representation] applies plainly to all such obtaining of property by the bankrupt, whether for himself or anybody else. *In re Kunkle*, 40 F.2d 563, 564.

This Court finds that the wording of Section 523(a)(2) of the Bankruptcy Code likewise is not limited to the obtaining of property or an extension of credit for the benefit only of the debtor, as no such specific limitation was enacted by Congress follow-

ing consistent interpretations of Section 17a(2) to the contrary. *See, McMillan v. Firestone*, 26 B.R. 706 (Bkrtcy.S.D.Fla. 1982). Furthermore, there is evidence supporting a finding that Bobcat, which did receive the extension of credit, was controlled by Fields, who was at all relevant times its sole shareholder and President. As such, Fields cannot shield himself from liability by using the corporate veil. *See, Rodgers v. Fallon, Jr.*, 29 B.R. 491, 10 B.C.D. 1054 (Bkrtcy.M.D.Fla.1983).

### Part Three

■ 1. Takeuchi seeks alternatively to have Fields' debt declared nondischargeable under Section 523(a)(6), which provides that a discharge does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." It is settled that Section 523(a)(6) can apply to the unauthorized disposition of collateral when "injury to the property rights of the secured party is an inevitable and known result of the debtor's action." *Bank of Green Cove Springs v. Brooker*, 36 B.R. 839, 841 (Bkrtcy.M.D.Fla.1984); *Trust Company v. Ricketts*, 16 B.R. 833 (Bkrtcy.N.D.Ga.1982); *In re Scotella*, 18 B.R. 975 (Bkrtcy.N.D.Ill.1982). In the case at bar, the Court has found that Fields' authorization and approval of the sales of Takeuchi's collateral amounted to a willful and malicious injury to the property of Takeuchi in accordance with the provisions of Section 523(a)(6).

2. As discussed in Part One, *supra.*, Fields cannot insulate himself from liability by reason of the fact that the property was sold as the property of Bobcat, as it was Fields' individual actions in authorizing and approving the sales of Takeuchi's collateral out of which his personal liability to Takeuchi arose.

■ 3. Although the Court has found that Fields' activities are within the exception to discharge of Section 523(a)(6) on its face, the injury to Takeuchi, and thus Fields' debt to Takeuchi, must be determined in light of the fact that it had merely an unperfected security interest in four of the six backhoes which are the subject matter of this action. While the Court recognizes that the security interest in all six backhoes was effective as between the parties, Takeuchi's security interest in the four backhoes was not superior to the rights of the trustee in bankruptcy of Bobcat. That is, had Fields not authorized the sale of Takeuchi's backhoes and had they remained in Bobcat's inventory up until the time of the commencement of Bobcat's Chapter 7 case, Takeuchi still would not have been able to realize on those particular four backhoes. Therefore, with respect to those goods in which Takeuchi had merely an unperfected security interest, "it cannot be said in any real sense that the defendant's action injured the plaintiff's property interests." *Bank of Green Cove Springs v. Brooker*, 36 B.R. 839, 841 (Bkrtcy.M.D.Fla.1984).

■ 4. With respect to those backhoes as to which Takeuchi had filed a financing statement, TB 1200, Serial No. 10092, and TB 1200, Serial No. 10093, Takeuchi had a perfected security interest which would have been superior to the interest of Bobcat's trustee in bankruptcy. As the security interest in those items secured all indebtedness of Bobcat to Takeuchi, the injury is the value of the security which was lost, not to exceed the amount of the secured indebtedness. *See, Trust Company Bank v. Ricketts*, 16 B.R. 833 (Bkrtcy.N.D. Ga.1982). In the case of TB 1200, Serial No. 10092, the evidence is that that machine was sold to Gail Scott for the purchase price of $26,936.00, and the Court finds that $26,936.00 is the value of that collateral. With regard to TB 1200, Serial No. 10093, there was no evidence of the resale price, but the Court finds from the resale prices of other similar machines in the record that the value of the machine was $25,000.00. Therefore, the total amount of the debt of Fields to Takeuchi which is declared nondischargeable pursuant to Section 523(a)(6) is the amount of $51,936.00. As this amount is included in the amount declared nondischargeable pur-

suant to Section 523(a)(2)(A), the total amount of Fields' nondischargeable debt will remain $84,310.80.

### Part Four

Takeuchi also urged in the Third Amended Complaint that Fields' debt to Takeuchi is nondischargeable in accordance with Section 523(a)(4) as a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." There was no evidence that Fields, individually, had any fiduciary relationship to Takeuchi. There was no evidence that either Bobcat or Fields individually had agreed to hold the proceeds of the sale of Takeuchi's collateral in trust or otherwise in a special account for Takeuchi's benefit. In any event, there was no evidence that Fields personally dealt with the proceeds or otherwise personally used money or property placed under his control. Finally, while the evidence supports the findings that Fields was liable to Takeuchi on theories of fraud and conversion, there was not sufficient evidence to support a finding that Fields was guilty of larceny. Consequently, the Court finds that Fields' debt is not nondischargeable pursuant to Section 523(a)(4).

Accordingly, it is hereby

ORDERED that the debt of Fields to Takeuchi in the amount of $84,310.80 is determined to be nondischargeable.

A separate final judgment will be entered in accordance with the foregoing.